**YUBA NATURAL RESOURCES, INC. and Placer Service Corp., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**No. 460–80L.**

United States Claims Court.

July 18, 1986.

John J. Dacey, San Francisco, Cal., for plaintiffs; Goldstein, Barceloux & Goldstein, of counsel.

Glen R. Goodsell, Washington, D.C., with whom was Asst. Atty. Gen. F. Henry Habicht, II, for defendant.

## OPINION

PHILIP R. MILLER, Judge:

Plaintiffs, Yuba Natural Resources, Inc. (Yuba) and Placer Services Corporation (Placer), brought this suit in August 1980 seeking just compensation for the taking by the defendant, acting through the Army Corps of Engineers, of Yuba's precious metal dredging rights (primarily gold deposits) on a tract of land in Yuba County, California, in which the government held the fee. The alleged taking occurred in April 1976, when the United States excluded plaintiffs from access to the claimed mineral rights.

However, almost 6 years later, after a district court upheld Yuba's title to the mineral rights, in January 1982 the defendant rescinded its ban on plaintiffs' mining the precious metal. Plaintiffs amended their complaint, recharacterizing their claim as one for a "temporary taking" from April 1976 to January 1982, and sought compensation only for that period during which they alleged defendant had interfered with their use and enjoyment of the property.

In 1983, this court granted summary judgment to the government on the ground that no taking had occurred because: (1) the United States acted in good faith, in its proprietary rather than in its sovereign capacity, to protect what it deemed to be its own property, and (2) the government neither took possession of the subject property nor physically barred plaintiffs from its use. *Yuba Goldfields, Inc. v. United States*, 1 Cl.Ct. 421 (1983) (*Yuba I*). The court distinguished prior decisions by the Court of Claims finding a taking in similar title disputes on the ground that in those cases the United States either also physically removed or restrained the private parties from going on the land, *Foster v. United States*, 221 Ct.Cl. 412, 607 F.2d 943 (1979), *Bourgeois v. United States*, 212 Ct.Cl. 32, 545 F.2d 727 (1976), or exercised or expressed its intent to exercise the power of eminent domain even if its claim of title was erroneous, making clear its liability for a taking. *Foster, supra; Yaist v. United States*, 228 Ct.Cl. 281, 656 F.2d 616 (1981).

On appeal, the court of appeals reversed and remanded for a full trial to determine whether or not on the complete record there was a taking. *Yuba Goldfields v. United States*, 723 F.2d 884 (Fed.Cir.1983) (*Yuba II*). It ruled that whether the government acts in a proprietary or sovereign capacity has little, if any, use in Fifth Amendment just compensation analysis, as the Fifth Amendment secures citizens against governmental expropriation and guarantees them just compensation for property taken whatever the government's reason therefor. It stated that neither physical invasion nor physical restraint is the *sine qua non* of a constitutional taking. It found the government was not acting like a private person protecting his own property when it informed plaintiffs that they were prohibited from dredging on the property, because there lurked behind such statement threats of penalties, criminal sanctions and the ability of the United States to call upon unlimited resources to exclude plaintiffs.

It found undisputed on the record before it, as indicia of the taking claimed, that in 1976 the United States was the initiating causal force in prohibiting Yuba from exercising dredging rights Yuba had exercised since 1905; that the United States had done nothing to judicially test its asserted claim to those mineral rights; that the United States had insisted during protracted negotiations that it would enforce its claimed rights; that the United States' communications to Yuba were more than mere opinion letters but "prohibited Yuba's exercise of its right to dredge and to enjoy possession of the minerals thereby unearthed." *Id.* at 890. It concluded that if upon the trial the record remained essentially unchanged, justice would be done if plaintiffs prevailed.

On remand, trial was held in July 1985. Pursuant to Rule 52(a), the findings of fact are contained in this opinion.

### Statement of Facts

By deed dated December 6, 1901, James O'Brien, the owner of fee title and/or unpatented mining claims in certain lands in Yuba County, quitclaimed to the United States his interest in a 442 acre tract (the 442), along with other lands, but reserved to himself his interest in the precious metals in the 442. The deed provided in pertinent part:

> But reserving and excepting unto the said party of the first part [O'Brien], his heirs and assigns, all precious metals on or in said premises with a right to extract the same, but in a manner not in any wise to interfere with, or to undermine or endanger any of the works constructed by or under the direction of the party of the second part [United States], said party of the second part or its authorized agents or employees to be the judge as to when said works are endangered or interfered with; but this reservation shall in no wise be construed as granting, confirming or conceding to the grantors the validity of any mining claim, or any mining locations included in said premises;

> \* \* \* \* \* \*

And provided that at any time such portions of said premises as shall have been already worked over, shall be available for use by the United States as a settling basin, on condition that said use shall not interfere with the mining of the remainder of said premises; and provided further than in any case all of said premises shall be available for use as a settling basin without restriction on and after January 1, 1952.

The United States acquired the land for debris control on the Yuba river. At the turn of the century the Yuba River was undergoing hydraulic mining, a process whereby its banks were eroded by high pressure hoses and the sand and gravel therefrom sifted for separation of the precious metals therein. After the gold was removed, the bulk of the material was simply returned to the river without recompaction. To prevent the passage of massive debris into the Sacramento and Feather Rivers, which were navigable, dams and barriers were to be erected to divert the river's flow into settling basins; and once settled, the water would be directed back to the Yuba downstream.

Subsequent to such acquisition, a form of dredge mining replaced hydraulic mining in this vicinity. Such dredge mining uses a floating barge equipped with an endless chain of heavy steel buckets each of which is capable of excavating 14 cubic feet of rock and sand with each scoop. The buckets gouge out, break down and scoop up the walls of rock, sand and gravel in front of the barge to whatever depth desired, and other equipment on the dredge separates the gold bearing sand, extracts the gold therefrom, and casts the residue behind it as the dredge moves forward. In effect the dredge thus creates a moving pond. The improvements in machinery, materials and dredging technology over the years now permit reaching greater depths and make economically feasible extraction of precious metals even in areas previously dredged one or more times.

Because the government no longer had any need for the debris control project as originally planned, the channels necessary to divert the flow into the basins were never constructed, and the 442 was never actually used for settling of river debris. Although the Corps constructed Daguere Point Dam and several other barriers around 1900–05 for debris control purposes, the government generally had no practical use for the land and sold some of it in 1911. Coincidentally, it sold about 1800 acres to Yuba Goldfields at that time. Other than for upkeep of the Daguere Point Dam, the government was not physically present on these lands during any of the period in dispute. Yuba, on the other hand, maintained an active presence thereon from 1905 to 1968 in connection with its dredging activities.

Yuba acquired the reserved precious metals interest in the 442, among others, by quitclaim deed in 1905. The area was dredged continuously for gold until 1968. By that time most, if not all, of the tract had been dredged at least once, and some areas had been dredged 5 or 6 times, each time to increasing depths. Yuba's dredges previously reached depths ranging from 50–80 feet. Yuba stopped dredging in 1968 because the fixed gold price, $35 per troy ounce, no longer allowed profitable gold recovery.

In 1968, Yuba, by its attorneys, sent the following letter to the Army Corps of Engineers:

We are general counsel for Yuba Industries, Inc. This corporation, amongst other things, is engaged in goldmining in Yuba County through its Goldfields Division.

Included with the properties of the Goldfields is a tract of land commonly known as the "O'Brien Tract". Yuba for many years engaged in goldmining activities in that tract under United States leases, licenses, patents or otherwise. All of these rights, as far as we know, expired in 1953.

Much consideration is being given by Yuba to a continuation of its mining enterprises in that tract.

\* \* \* \* \* \*

We would, therefore, very much appreciate your advising us what steps should be taken by Yuba in order to obtain the mining rights referred to.

In 1969, the Corps responded that as part of the Marysville Dam project titles to lands in the area were being studied and that "dredging rights on [the O'Brien] tract must be withheld until all studies in that area have been completed and the plan has been submitted and approved by the Chief of Engineers."

Because gold recovery on an economic basis was unlikely, Yuba made no effort to resume dredge mining in any area from 1968 to 1975. Instead, it maintained the property, as well as one of its dredges (21), and derived income from gravel sales, land sales, fishing permits and sightseeing. It also obtained secured loans from its parent corporation, Yuba Industries.

In 1975, rising gold prices caused Yuba to consider resuming dredging operations in an area of the O'Brien tract known as the "deep reserves," which includes the 442, but at greater depths than it had previously dredged, from 100 to 200 feet below dredge level. In April 1975, Yuba started up dredge 21 on its property in an area northeast and outside the 442. The full-scale operation was designed to test the dredging equipment, validate environmental permits, and train personnel; and it continued until June 1976. The dredge operated on a break-even basis, and Yuba determined that more intensive operations could be profitable.

During the testing period, Yuba received a letter from the Corps, dated April 16, 1975, advising it that the United States "does have valid interests in portions of the lands upon which you are apparently conducting your gold mining activities, as well as lands upon which you apparently plan to conduct future operations * * * You are further notified that you will be held accountable for any removal of precious metals, sand, gravel, and other materials which

may legally be the property of the United States." Yuba responded by letter dated May 9, 1975, attaching a map of the areas it proposed to dredge (about 4000 acres) and inquiring "if dredging on these lands would constitute an invasion of property interests of the United States, we would like to be informed specifically where and why." The Corps then requested an opinion as to title from the Attorney General, and the latter determined that the United States owned the precious metals rights in the 442.

Despite its conclusion that it had the basis for a viable gold mining project, in 1975–76 Yuba lacked both money and expertise to undertake the project alone. Yuba considered additional equity financing, such as borrowing through long term debentures and bonds, but concluded finally that financial support would only come from a joint venture or partnership. It began to look for a partner to contribute substantial sums of money and technical skill. Accordingly, Charles Silbert, then president of Yuba, contacted every major mining company to discuss the possibility of a joint venture or partnership.

The only serious response came from Placer, a subsidiary of St. Joe Mineral Corp. and a plaintiff herein. Negotiations between Placer and Yuba began in August 1975. In December, Placer proposed a lease agreement for mining the "deep reserves."

On February 25, 1976, in a letter addressing water permit requirements,[1] the Corps advised Yuba that a response to its May 9, 1975 inquiry "as to the invasion of property interests will be issued later." On March 4, 1976, Yuba's attorneys sent the Corps a letter describing 1,045 acres which Yuba intended to "explore and exploit." An attached map displayed a polygon shaped area representing the heart of the deep reserves.

---

1. Considerable correspondence between Yuba and the Corps took place in this same period with respect to whether Yuba's proposed operations required permits under section 404 of the Federal Water Pollution Control Act; such permits are issued by the Corps.

In March 1976, Placer sent Yuba an updated proposal for a lease agreement. Placer proposed to pay Yuba, upon execution of the lease agreement, rent of $25,000 "for the right to investigate and evaluate the Deep Reserves and peripheral areas for a period of 6 months." This "Evaluation Period" could be extended for two successive quarters at rent of $25,000 per quarter. Following the period of evaluation, and on the condition that Placer concluded "the project merits further investment," Placer could exercise an option to purchase dredges 21 and 17 and their related parts and equipment (Yuba's only dredging equipment) for $1,450,000.[2] If, however, Placer decided at the end of the Evaluation Period that the project was without merit, it could terminate the agreement without further cost, while Yuba would keep the rent received. Placer proposed it be given up to 2 years to complete the equipping work necessary to begin mining the Deep Reserves. If more time was needed, Placer would pay Yuba additional rent of $25,000 per quarter, which would rise by the end of the fourth year to $50,000 per quarter. If after 6 years Placer had not commenced mining, Yuba could terminate the agreement and retain all rent and royalties received.

For its part, Yuba would contribute its interest in the deep reserves, and the cash it earned from the sale of the dredges to Placer. It would receive royalties of 4 percent of net sales for the first 4 years of mining, and 6 percent of net sales for the remainder. If Placer suspended mining for more than 2 years, Placer would pay Yuba a quarterly minimum royalty of $50,000 until mining resumed. Placer had primary responsibility for managing the project, and would run the daily operations.

By March 1976, Yuba and Placer had reached substantial agreement on the terms of joint venture. The most significant change from the proposals outlined previously was that instead of the percent-

age royalties, Yuba would receive a one-third share of the proceeds of the joint venture, and Placer would receive the remainder. The preliminary plans called for overhauling the two dredges to reach the greater depths necessary to exploit the Deep Reserves. Dredge 21 would be adapted to about 140 feet and dredge 17 to 170 feet capability. Reconstruction was anticipated to cost $5–10 million. The parties planned to overhaul dredge 21 first, expecting a minimum period of 15–18 months before that dredge could be deployed. Reconstruction of dredge 17 would follow, its deployment planned for 12–18 months after dredge 21 started. If the agreement was signed (as anticipated) in mid–1976, dredge 21 was scheduled to begin operating about October 1978, and dredge 17 about January 1980.

On March 12, 1976, in response to Yuba's dredging plans, the Corps advised Yuba that these lands were in an area being reviewed for United States ownership and that if the area of proposed operations was "ultimately determined to be Government owned there will be a strict accounting of any minerals removed."

On April 9, 1976, the Corps responded to Yuba's inquiries as to title and its proposed plans for dredging. In pertinent part that letter stated:

> The Department of Justice has now completed its review and the proposed plan of dredging operations map furnished by Mr. Silbert in his letter of 9 May 1975, has been annotated, copy enclosed, to show the decision of ownership by the US Attorney General's office. Based upon this decision, our rights in the dredging areas will be enforced as follows:
>
> \* \* \* \* \* \*
>
> b. The areas crosshatched with vertical lines [the 442 tract] represent areas owned outright in fee by the United States for the Yuba River Debris Control Project with no reservations in the title.

**2.** If Placer elected to withdraw from the project, it agreed to return dredge 21 to Yuba for $150,000 but retain dredge 17.

Dredging activity or removal of any material, including precious metals is prohibited.

\* \* \* \* \* \*

From available information, it is our opinion that dredge "Lisa" [21] is operating in Section 28, T. 16 N., R. 5E., north of the Yuba River meander line on fee lands of the United States that are subject to a reservation of precious metals. It is our understanding from Mr. Silbert's letter that Yuba Goldfields has acquired this reserved right. We assume this claim is factual but have not verified it by documents of title.

If you believe you have information or data that would modify our decision, please forward it for our review.

Nevertheless Yuba continued to negotiate the joint venture. On April 13, 1976, Placer proposed that the agreement "should permit mining operations by Placer for as long as Placer believes the property can be mined." On April 26, 1976, Placer sent a draft agreement "intended to reflect the correspondence between the parties." The draft contained the following clause:

Yuba has good and merchantable title \* \* \* Placer shall have quiet enjoyment of the property until the termination of this Agreement. \* \* \* Yuba agrees that during the term of this Agreement it will, to the extent reasonably requested by Placer and at Yuba's expense, take prompt action to defend its title to the Property as warranted herein and to cure any defects in such title. If Yuba fails to take such action promptly following Placer's request, Placer may, at Yuba's expense, take all action it deems necessary for this purpose, and may deduct the cost thereof from any payment due to Yuba hereunder.

The record indicates that Placer had not yet been informed of any potential dispute as to ownership of the mineral rights in the 442. The foregoing clause was a standard term for this type of leasing agreement, not a response to the exchange between the Corps and Yuba.

On April 27, 1976, Yuba requested that the Corps supply information as to the nature and source of the government's claims so that Yuba "may continue our efforts to reconcile them with our known interest in the property." Yuba asked also to meet with the Corps' District Engineer's staff to discuss the issues raised in the April 9 letter. The Corps' response, dated May 12, stated in part:

Thank you for your letter of 27 April 1976 pertaining to land titles in the vicinity of your dredging operations near the Yuba River, Marysville, California. The property rights in the dredging area that were set forth in our letter of 9 April 1976 and detailed in subparagraphs a to c were obtained from the official records of the County of Yuba and the records on file in the Bureau of Land Management Officer, Sacramento, California. The Attorney General's opinion was based upon a review of these records.

\* \* \* \* \* \*

It is recommended that you investigate the official records as to the accuracy of the land titles included in our letter of 9 April 1976. If you are unable to reconcile these matters, I will be pleased to arrange for a personal meeting as you suggested.

Subsequent meetings between Yuba and the Corps did not resolve their opposing interpretations as to title to the precious metals of the 442. Yuba asserted its title was valid, and the government maintained that Yuba's title had expired. The Corps' April 9 statement that mining "is prohibited" was not specifically discussed, nor were any sanctions if Yuba were to mine the 442.

Yuba informed Placer of the title dispute in July 1976. Not interested in the joint venture without the deep reserves, especially the 442, Placer declined to execute the joint venture agreement. Placer indicated its willingness to resume if Yuba cleared title, but so long as the government clouded Yuba's title Placer would not commit its resources to the project.

Although Yuba had the right to institute litigation in a federal district court for a declaratory judgment as to title, pursuant to the Quiet Title Act, 28 U.S.C. § 2409a, enacted in 1972 for the purpose of giving courts jurisdiction to resolve disputes just such as this, it decided that a better strategy to obtain the disputed mineral rights was to acquire them from the government in a trade for other property which Yuba had and the government might want. This decision took into account the risks of litigation, the expense, the length of time it would take to obtain a final judgment, and the fact that the government planned no immediate effort to obtain the minerals but was only protecting its rights.

Yuba first proposed a trade of land for mineral rights at a meeting with the Corps on September 29, 1977. It proposed that the Corps trade its interest in the deep reserves for Yuba lands in the vicinity of the sites being considered by the Corps for a dam near Marysville. In late 1977, Yuba again contacted the Corps to discuss a possible trade of lands to clear title.

On or about December 1977, Marvin Kratter, an independent investor, evaluated Yuba's claim and the aborted Placer contract. He was persuaded that economic conditions justified every reasonable effort to recover and sell the gold at that time and that there were good opportunities for profit. He purchased slightly less than a controlling interest in Yuba's stock directly from the company for $2 million and became chairman of the board and chief executive officer. Mr. Kratter thereupon actively promoted a negotiated settlement with the Corps. He explained:

> I felt that it was so urgent to resolve this, that I was prepared to, in the vernacular of the gutter, "give away the store" in order to get the thing going, because all the economic advice that I had had was that gold would continue to rise in value, and I felt that it was important to posture the company into a position where it could sell gold, both on a spot basis as well as a forward basis, and that no matter what you gave away,

within reason of course, it would be more advantageous to the company to do that in the settlement than it would to risk, based on legal experiences I've had, seven to eight years in litigation and appeals, and so on, and the costs.

Mr. Kratter also thought it unwise to file suit under the Quiet Title Act because "I never believed in threatening litigation in a case you're trying to settle."

Yuba and the District Engineer, District Counsel and Chief of Real Estate of the Corps' Sacramento Office executed a formal land exchange agreement on January 29, 1979. The Agreement described the exchange and attached two quitclaim deeds to be approved and executed by Yuba and the Secretary of the Army. The Corps officials emphasized that final approval was reserved to the Secretary of the Army, but they told Yuba that approval was "merely a formality" given the approval by the local and regional officers and the successful negotiation of similar settlements by the Corps.

Although the exchange agreement had not yet been signed by the Secretary of the Army, on October 15, 1979, Yuba and Placer executed their joint venture agreement "for the mining of gold and other precious metals of approximately 2,000 acres of land (Deep Reserve Area) in Yuba County, California owned by Yuba." Placer signed the agreement based on its belief that title in Yuba would become clear "in view of the very attractive offer made by Yuba" and that final approval of the execution of the Yuba-Corps settlement was "almost a foregone conclusion."

However, by 1980, the exchange agreement had not yet been approved and executed by the Secretary of the Army. In January, Yuba notified the Corps in Washington, D.C., that if approval by the Secretary was not forthcoming by February 15, 1980, Yuba would rescind the agreement. The agreement was not signed by the given date.

Meanwhile Yuba and Placer moved ahead with the joint venture. Placer began significant expenditures to reconstruct

dredge 21 in anticipation of moving into the 442. On April 2, 1980, Yuba and Placer initiated a contingency plan, whereby dredge 21 would be moved from its reconstruction pond to an uncontested area south of the 442 where dredging would begin. Yuba received permission from the Corps to dig a channel and to move its dredges across the 442. Yuba and Placer spent almost $500,000 to cut the channel, and moved only dredge 21 through the tract.

On June 12, 1980, Yuba filed a quiet title action in the U.S. District Court for the Eastern District of California, and informed the government that the Corps' conduct might amount to a taking. Two weeks later, Yuba notified the Corps that, although it expected to win its quiet title suit, it preferred the exchange agreement. If the Secretary signed the Agreement by December 31, 1980, Yuba would implement the exchange agreement and dismiss its suit.

On October 27, 1980, the Chief Counsel for the Corps in Washington, D.C., advised Yuba that it could not enter into the land exchange agreement for the reason that:

The Corps of Engineers has concluded that it has no authority to acquire real estate for the Marysville Project and without such authority the Secretary of the Army could not enter into such an exchange of land with Yuba Goldfields, Inc.

The only authority the Secretary of Army may exercise under the Exchange of Lands Act is to transfer Government property to secure land "required" for a project. Although the Marysville Project was authorized by Congress for a Phase I Study, there is neither authority nor appropriation for acquisition of lands. In fact, at this time, there is no basis on which one could determine what lands would be required for the project.

Accordingly, I have asked the Department of Justice to proceed with defense of [the quiet title suit].

On June 2, 1981, the District Court entered an order confirming Yuba's right to the gold under the O'Brien deed. The court held:

The precious metal rights reserved and excepted * * * did not terminate on January 1, 1952. Rather, by the terms of the 1901 Deed, the Right of [Yuba] to extract precious minerals from tract "Third" became, as of January 1, 1952, subject to the right of the United States to use all of tract "Third" for a settling basin irrespective of whether or not [Yuba] had completed mining operations thereon.

Judgment was entered for Yuba on August 11, 1981. The United States filed a notice of appeal on September 18, 1981, which it dismissed on January 4, 1982. On January 29, 1982, the District Engineer of the Corps' Sacramento Office wrote to Yuba and formally withdrew its letter of April 9, 1976, stating:

You are hereby advised that because of the decision in [the quiet title suit] * * * the letter is hereby withdrawn in its entirety.

It is noted that Yuba (and Placer Service Corp.) was verbally informed at a meeting in Washington, D.C., on October 14, 1981, that if there ever was a question of prohibition by the Corps of the physical exercise of its rights, that as of that date Yuba could proceed with its operations.

The joint venture parties completed reconstruction of dredge 21 in September 1981, and began full-scale dredging operations southeast of the 442 on October 1, 1981. Although the dredge operators made efforts to keep the path back to the 442 clear, and the 442 became freely available after the government dismissed its appeal, Yuba and Placer deemed a course reversal uneconomic. Instead, they moved the dredge on a circular course to head back to the 442 and continued ore recovery, which proved unprofitable. The dredge did not enter the 442 until November 1984.

### Discussion

### *Was There a Taking?*

■ Insofar as the question of a taking in 1976 is concerned, the record at trial

does not change the facts significantly from those appearing in the record on appeal from the prior grant of summary judgment. The fact that Yuba had not mined the property since 1968 does not mitigate the taking, as it was a part of their property right to resume at any time. That Yuba was in financial straits and not likely to proceed with mining is likewise of no consequence, as its exclusion by the government prevented any sale or joint venture with one better suited financially to resume mining. The government does not contend the gold in the ground was worthless, or it would not have excluded plaintiff from extracting it. That Yuba and not the United States initiated the title inquiry by its 1968 letter to the Corps is similarly irrelevant, since the district court found the mineral rights were in fact Yuba's property and thus subject to constitutional protection against taking. That Yuba may not have been able to mine the property for at least 2 years after 1976 in any event, while its deep dredge was being outfitted, likewise does not mitigate the taking, for, as the evidence shows, dredging in the 442 was delayed still more because of Yuba's inability to enter the barred area as it planned. Finally, the fact that the government in good faith believed the mineral rights to be its own does not change the constitutional picture, as precisely this issue was previously before the court of appeals and held not to be controlling.

It is concluded therefore that the government's express prohibition of plaintiffs' mining, despite its refusal to bring an action to support its claim of title, effectively deprived Yuba of any use of its property and, as of 1976, constituted a taking of that property.

Defendant's reliance on the fact that the prohibition contained in its letter of April 9, 1976, was mitigated by language indicating that the United States was willing to change its position, i.e. "If you believe you have information or data that would modify our decision, please forward it for our review," is misplaced. The entire letter, including the mitigating language, was in the record before the Federal Circuit and had no effect on its decision. Moreover, defendant has not shown what additional data or information there was which could conceivably have changed defendant's position. Finally, Yuba did attempt to have the Corps modify its position until the quiet title action was decided, but the Corps was intractable. Thus its initial position was in fact both final and absolute; the offer to modify does not negate the later refusal to do so.

In support of its contention that the fifth amendment does not require compensation for the taking of property which the government in good faith, although mistakenly, believes to be its own, defendant relies on an excerpt from *United States v. Lynah*, 188 U.S. 445, 464–65, 23 S.Ct. 349, 355, 47 L.Ed. 539 (1903), to wit:

> The rule deducible from these cases is that when the government appropriates property which it does not claim as its own it does so under an implied contract that it will pay the value of the property it so appropriates. It is earnestly contended in argument that the government had a right to appropriate this property. This may be conceded, but there is a vast difference between a proprietary and a governmental right. When the government owns property, or claims to own it, it deals with it as owner and by virtue of its ownership, and if an officer of the government takes possession of property under the claim that it belongs to the government (when in fact it does not) that may well be considered a tortious act on his part, for there can be no implication of an intent on the part of the government to pay for that which it claims to own. Very different from this proprietary right of the government in respect to property which it owns is its governmental right to appropriate the property of individuals.

From this defendant argues that its "contention of ownership during this period removes the dispute from that of taking."

Defendant misconstrues *Lynah*. That was the last of a series of cases holding

that the jurisdiction of the Court of Claims in a suit for just compensation for a taking depends upon there being an implied contract to pay such compensation; i.e., if the United States concedes private ownership of the property the government takes, then it impliedly agrees to pay just compensation for it, but if the government claims ownership, it may not be deemed to have agreed to pay anything for it. And *see also Schillinger v. United States*, 155 U.S. 163, 15 S.Ct. 85, 39 L.Ed. 108 (1894); *Hill v. United States*, 149 U.S. 593, 599, 13 S.Ct. 1011, 1013, 37 L.Ed. 862 (1893); *United States v. Great Falls Mfg. Co.*, 112 U.S. 645, 5 S.Ct. 306, 28 L.Ed. 846 (1884); *Langford v. United States*, 101 U.S. (11 Otto.) 341, 25 L.Ed. 1010 (1879).

However, in *United States v. Causby*, 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946), the Supreme Court repudiated the notion that the jurisdiction of the Court of Claims over a claim of taking by inverse condemnation depends on the theory of an implied contract. It stated (*id.* at 267, 66 S.Ct. at 1068):

> We need not decide whether repeated trespasses might give rise to an implied contract. If there is a taking, the claim is 'founded upon the Constitution' and within the jurisdiction of the Court of Claims to hear and determine. Thus, the jurisdiction of the Court of Claims in this case is clear.

And *see also Foster v. United States*, 120 Ct.Cl. 93, 97–99, 98 F.Supp. 349 (1951), *cert. denied*, 342 U.S. 919, 72 S.Ct. 365, 96 L.Ed. 687 (1952); *Cotton Land Co. v. United States*, 109 Ct.Cl. 816, 829, 75 F.Supp. 232 (1948).

Thus *Lynah* and its predecessors no longer set up a jurisdictional bar to a suit for just compensation merely because the government mistakenly claims the property as its own.

## Standing of Placer

Defendant contends that Placer has no standing to sue for a taking of the mineral rights. Defendant is correct.

■ Any claim by Placer with respect to the mineral rights in the 442 is barred by the rule in *United States v. Dow*, 357 U.S. 17, 78 S.Ct. 1039, 2 L.Ed.2d 1109 (1958). There the Supreme Court refused a claim by a landowner who obtained his deed in the condemned property after, and with notice of, the government's occupation and planned condemnation, for the reason that (357 U.S. at 20–21, 78 S.Ct. at 1043–44):

> Dow can prevail only if the taking occurred while he was the owner. For it is undisputed that "[since] compensation is due at the time of the taking, the owner at that time, not the owner at an earlier or later date, receives the payment." [Citations omitted.]

Due to defendant's claim of ownership, Placer did not enter into the lease agreement in 1976. Accordingly, at the date of the taking, April 9, 1976, Placer had no rights in the property. For the same reason, Placer has no standing in this case by virtue of its subsequent leasehold interest in the 442, created by the execution of the 1979 lease agreement. *See also Yaist v. United States*, 228 Ct.Cl. 281, 291, 656 F.2d 616, 623 (1981); *Cooper v. United States*, 8 Cl.Ct. 253, 254–55 (1985).

■ Placer also may not prevail on the theory that the government took its property by preventing consummation of the 1976 lease agreement. The destruction of Placer's expectations in the venture is not a taking of property for which the fifth amendment requires compensation. *Omnia Commercial Co. v. United States*, 261 U.S. 502, 43 S.Ct. 437, 67 L.Ed. 773 (1923) (loss of beneficial contract price due to government taking of contract's subject not a taking); *Florida Rock Industries, Inc. v. United States*, 791 F.2d 893, 903 (Fed.Cir.1986) ("frustration of performance of even an existing contract is not a taking of contract rights"); *Yachts America, Inc. v. United States*, 779 F.2d 656, 660 (Fed. Cir.1985) (loss of expected revenues from concessions not compensable separately on taking of lease). *And see also Mitchell v. United States*, 267 U.S. 341, 344–45, 45 S.Ct. 293, 294, 69 L.Ed. 644 (1925) (loss of

business is non-compensable incident of a taking of land); *Rowland v. United States,* 8 Cl.Ct. 267 (1985), *aff'd without opinion, per curiam,* 790 F.2d 92 (Fed.Cir.1986) (loss of value of equipment in place compensable only to extent it increases value of leasehold).

## *Just Compensation*

■ To hold that there was a taking of Yuba's mineral rights does not of course dispose of the case, because we must still evaluate whether the evidence supports the argument that the government took $34,-144,400 in property (as plaintiffs now claim) or that they sustained a loss in that amount or any sum approaching it. Plaintiffs argue that the government took the property for a temporary period, i.e., 6 years, and, as a result, they lost the net proceeds which they would have recovered in that period in excess of what they did in effect realize from the overall mining operations during the period. They contend that had the 442 deep reserves had been available, they would have proceeded with much greater efficiency and greater recovery in the overall operations than they were able to accomplish without such reserves during the 6 years.

Plaintiffs' evidence with respect to the value of the extraction and sale of the 442 gold reserves foregone was divided into three parts:

1. The quantity of gold which the venture would have dredged in the 442 during the 6 year period absent the taking by the United States.

2. The foregoing multiplied by the value of gold during that period.

3. Less the value of that same amount of gold today.

To establish a production estimate, plaintiffs relied first on evidence as to the tenor of the gold[3] in the 442 tract, which could have been dredged, as determined by a series of core drillings recorded in drill logs. Plaintiffs then computed estimates of what gold production would have been absent the taking. This figure was based on several assumptions: a two dredge operation, with dredge 21 operating from October 1978 to January 1982, and dredge 17 operating from April 1980 to January 1982; a hypothetical course for each dredge; 500,000 cubic yards per month of alluvial material processed per dredge; and a weighted average gold tenor (114.6 and 132.4 mg per cu. y.) for dredges 21 and 17, respectively.

To calculate the gross sales value of the gold extracted, plaintiffs' expert witness multiplied the average price of gold from 1978 through 1982—$449.50 and $512.48 per ounce for dredges 21 and 17, respectively—by the estimated production quantities.

From the resulting gross sales value, plaintiffs subtracted the estimated cost of production to produce a "net sales value." A weighted average cost of $272–$373 per ounce of gold was derived from the actual costs of dredging in 1981–84 in the uncontested area and was adjusted to account for inefficiencies Yuba attributed to the taking, to discount inflation, to include start-up costs and other factors.

Since in fact at the end of the 6–year period all of the gold contemplated in the hypothetical production still remained in the ground for plaintiffs to mine and sell in the future, plaintiffs further adjusted the hypothetical net sales value by a credit for the value of unmined gold. This credit was at the rate of $30 per ounce in the ground, taking into account 1985 prices and consideration of the risks of extraction and inflation, and represented about 10 percent of the market price of recovered mined gold.

Plaintiffs claim that because of their inability to mine the gold due to the government's prohibition during the 6 years they sustained an economic loss of $30,910,000.

---

**3.** Gold tenor is the quantity of gold per unit of alluvial material, measured as milligrams of gold per cubic yard (mg/cu. y.).

To this plaintiffs would add in the just compensation computation other direct losses they claim to have suffered as a result of the taking. First, dredge 21 was in a pond north of the 442, and in order to reach land which was uncontested by the defendant plaintiffs had to dig a trench through the 442 with defendant's permission, without, of course, recovering any minerals enroute. Plaintiffs' evidence established that they spent $477,240 to so move the dredge.

In addition, plaintiffs claim that they sustained operational losses in excess of $2,000,000 because the government's interference caused them to dredge in a less efficient pattern through leaner areas than originally planned. Still further, plaintiffs claim compensation in the sum of $669,157, representing interest expense on $2.5 million they were required to borrow in order to build the aforementioned canal and as a result of operating losses. But for defendant's interference, they claim, this interest expense would not have been incurred. Plaintiffs argue that such losses, caused by a temporary as opposed to a permanent taking, must be considered in determining just compensation.

Defendant offered no independent proof of the value of the property owed as just compensation. It opposes plaintiffs' calculation method, however, on the ground that plaintiffs essentially hypothesize foregone profits, which courts routinely reject in just compensation analysis as an inappropriate measure of what a willing buyer would pay a willing seller for property, i.e., its transfer value.

Defendant is correct. Such "methodology is objectionable for the * * * reason that, by dispensing with the fair market value test in determining the occurrence of a taking, it makes the case improperly one to recover for the frustration of business expectations." *Florida Rock Industries, Inc., supra*, at 903.

There are many fallacies in plaintiffs' conception of the fair market value of a temporary taking of its property. However, because the court rejects plaintiffs' conception that there was a temporary rather than a permanent taking, the court finds it unnecessary to review them at length.[4]

---

4. To mention but a few of the defects in plaintiffs' reasoning:

1. Even in a temporary taking the measure of the value thereof is what a willing buyer and willing seller would arrive at in dealings at arms' length, *U.S. v. General Motors Corp.*, 323 U.S. 373, 65 S.Ct. 357, 89 L.Ed. 311 (1945), whereas plaintiffs' calculations take into account only their most favorable prognostications as to what they might have realized during the 6-year period.

2. Plaintiffs ignore the various risks that could prevent the realization of plaintiffs' prognostications and that a willing buyer and willing seller would have to consider in arriving at fair value.

3. Plaintiffs estimated that the dredges would achieve average recovery of 500,000 cubic yards of alluvial materials per month, while the actual level of average production was only 313,000 cubic yards per month.

4. Plaintiffs assumed that the dredges could operate without downtime and breakdowns and at maximum efficiency, when in fact the dredges had never operated at such great depths and their personnel had never had any such experience with them before. Indeed, on one occasion in its actual operations the first dredge irretrievably lost its chain of buckets.

5. Plaintiffs estimated that the tenor of the deposits, as indicated in the drilling logs, would provide an accurate measure of the entire tract at the new depths when it was only an estimate subject to corroboration in the actual drilling, and even Placer in its contract would not accept that as a fact but made it subject to verification over a period as long as a year.

6. Plaintiffs failed to make adequate allowances for the risks of increases in the projected cost of recovery, i.e., materials, equipment and labor, over the 6-year period.

7. Plaintiffs failed to take into account the risks of fluctuations in the value of gold when recovered over the 6 years, which was highly volatile at the time.

8. Plaintiffs failed to take into account the prospect that a willing buyer would consider the unproved technology of operating at much greater depths than previously as a risk which should be reflected in the price.

9. Plaintiffs ignore the only objective evidence in the record with respect to the arms' length evaluation of a 6-year suspension of operations, namely, the proposed 1976 contract between Yuba and Placer under which Placer was to acquire a two-thirds interest in the gold. Placer was free to evaluate independently the economic feasibility of the entire project, and if, as a result thereof, it engaged in no production

Plaintiffs concede that their method of computing just compensation, i.e., determining the owner's loss during a limited period, is only appropriate when there is less than a complete taking of the property and where the taking is only for a temporary or limited period and the owner expects to get his property back less whatever loss is expected to be sustained to the property in the interim.

Although the Yuba's mineral rights were returned to it by the United States in 1982, nothing in the record supports the notion that in 1976 the United States took such rights only for a temporary period. When on April 9, 1976, the United States barred Yuba's right to dredge and enjoy the possession of the minerals thereby unearthed, it did not confine such prohibition to any limited period. It did nothing to test judicially its asserted claim to the mineral rights and neither said nor did anything to indicate any intention to do so. During the entire negotiations, it insisted that it would enforce its claimed rights. That 6 years later the government chose to return the property to Yuba rather than to pay just compensation for what it had taken in 1976 did not retroactively convert the government's absolute taking of Yuba's property into a temporary holding thereof. The government was not obligated to return the property at the end of 6 years or any other limited period rather than pay just compensation therefor; and, similarly, Yuba was not obligated to accept the return of the property rather than to demand just compensation therefor. Indeed, the

very fact that Yuba originally brought this suit in August 1980 for just compensation for a permanent taking confirms that there was no understanding that the taking was temporary in nature. That defendant chose to return the property voluntarily in 1982 rather than to pay just compensation for it, and that plaintiff was willing to accept the return of the property rather than to insist upon just compensation, cannot be effective to change the original taking from a permanent one to a temporary taking. How the government responded to the loss of the quiet title action is of no relevance to the nature of its earlier act. *Yuba II,* 723 F.2d at 888.

The decision in *Foster v. United States,* 221 Ct.Cl. 412, 607 F.2d 943 (1979), is directly in point. There, in 1941 a conveyance of land to the United States had excepted from the grant various hydrocarbons and "other minerals." In 1971 the plaintiffs sought to remove dolomite rock from the land, but, by letter dated November 18, 1971, the Air Force denied permission to do so on the ground that dolomite was not an "other mineral" within the meaning of the deed. The trial judge ruled that dolomite was such a mineral and that a *temporary* taking of the plaintiffs' mineral interest occurred on November 18, 1971. The Court of Claims agreed with the trial judge that the denial to plaintiffs of access to their property did constitute a taking but disagreed with his conclusion that it was a *temporary* taking. It stated (*id.* 221 Ct.Cl. at 424–26, 607 F.2d at 950):

over 6 years it was liable to Yuba for an aggregate of only $575,000 (see discussion at 491, *ante* ).

10. Plaintiffs also ignore the fact that in 1977 Mr. Marvin Kratter was able to purchase what he characterized as "a little bit less than control" of the entire company, which included the value of *all* its gold deposits, for only $2 million.

11. Plaintiffs' own expert witness testified that the data upon which he relied did not permit him to make any estimate as to the price at which a willing buyer and a willing seller would have arrived in 1976 or any other year. He stated that such evaluation was not what he was asked to do.

12. Plaintiffs' claims are based on loss of profits rather than fair market value of the

mineral interests, although it is well established that this is an improper measure of the value of a taking. *United States ex rel. TVA v. Powelson,* 319 U.S. 266, 63 S.Ct. 1047, 87 L.Ed. 1390 (1943); *United States v. Sowards,* 370 F.2d 87, 90 (10th Cir.1966); *Foster v. United States,* 2 Cl.Ct. 426 (1983), aff'd, 746 F.2d 1491 (Fed.Cir.1984), *cert. denied,* 471 U.S. 1053, 105 S.Ct. 2112, 85 L.Ed.2d 478 (1985).

13. If there was a temporary taking, it is difficult to understand why it should be deemed for a 6–year period when plaintiffs prolonged the period because of a strategic decision to negotiate with the Corps of Engineers for a trade rather than to chance an adverse decision in an action to quiet title, which, when finally instituted, took only 18 months.

The Government's actions in this case, in essence, constitute a series of incremental denials sufficient to constitute a *permanent taking.* * * * As early as 1969, prior to plaintiffs' acquiring their interest, the Government began asserting that the owners of reserved mineral rights had no legal rights to dolomite on Tract 83. Plaintiff James Mosby was advised orally on November 3, 1971, that permission to remove dolomite would be denied. Then on November 18, 1971, permission was formally denied after Mosby's further request.

\* \* \* \* \* \*

In sum, we conclude that the permanent taking of plaintiffs' property interest in Tract 83 *vis a vis* the right to quarry and remove dolomite occurred on November 18, 1971, for which plaintiffs are entitled to be compensated.

Finally, the issue of damages must be addressed. The trial judge, in his recommended opinion, found only a *temporary* taking of plaintiffs' mineral rights as opposed to our decision today that such rights were *permanently* abrogated by defendant. We are, therefore, constrained to remand this issue to our Trial Division for ascertainment of plaintiffs' damages based on the permanent deprivation of plaintiffs' interests. * * *

As previously mentioned, in *Yuba I,* this court sought to distinguish *Foster* on the ground that, when the United States lost its claim to the mineral rights at issue, it exercised its power of eminent domain and acquired all rights, while in the present case the United States merely asserted a claim "only long enough to obtain a judicial determination and gave up when the court ruled against it." *Yuba I,* at 426. The court of appeals responded (723 F.2d at 888):

> [I]f the United States took possession or physically restrained plaintiffs in *Foster,* * * * those circumstances [i.e., whether the government intends to keep or return the property should its claim be wrong] would be irrelevant. Equally irrelevant in determining whether a taking

by inverse condemnation occurred is what may have been the United States' response, after the taking, to a court ruling against it, whether that response be acceptance, as here, or nullification by exercise of the eminent domain power as in *Foster.*

An additional reason why the taking in this case should not be regarded as a temporary one is that, as a practical matter, it would prevent objective valuation of what was taken. The length of such a taking was under plaintiffs' control. Yuba could have brought its action to quiet title immediately or it could have waited, as it did, for more than 4 years. Even in a temporary taking, the value is what a willing buyer and willing seller would negotiate. *United States v. General Motors Corp.,* 323 U.S. 373, 65 S.Ct. 357, 89 L.Ed. 311 (1945). The fact that the claimants had the power to manipulate the duration and damages would prevent any such objective inquiry. *See United States v. Dow,* 357 U.S. 17, 25, 78 S.Ct. 1039, 1046, 2 L.Ed.2d 1109 (1958).

Plaintiffs have produced no authority which would support the theory that a permanent taking becomes a temporary one as a result of events leading to the return of the property 6 years later.

Their reliance on section 2409a(b) of the Quiet Title Act (28 U.S.C.) for this purpose is misplaced. That provision merely authorizes the district court, in the event that the United States loses a quiet title action but chooses to exercise its power of eminent domain to retain the property nevertheless, to determine just compensation in the same proceeding. It does not characterize the nature of the act giving rise to the title dispute as "permanent" or "temporary" for Fifth Amendment purposes, nor was it so intended. *See* H.R.Rep. No. 1559, 92d Cong., 2d Sess., *reprinted in* 1972 U.S. Code & Cong.Adm.News 4547-48 (purpose to allow determination of just compensation in same proceeding and without regard to jurisdictional amount).

Plaintiffs' reliance on *United States v. Westinghouse Electric & Mfg. Co.,* 339 U.S. 261, 70 S.Ct. 644, 94 L.Ed. 816 (1950)

is similarly misplaced. In that case, the Supreme Court reiterated that the usual rule for ascertaining value is at the time of taking, but for practical reasons allowed an exception for one item. In the case of a taking of a portion of a leasehold for a term shorter than that of the condemnee's, but with an option to renew, for purposes of computing damages it permitted consideration of the length of the government's actual occupation. But that holding applies only to takings of a portion of a condemnee's leasehold, where the government's occupation is of uncertain duration at the outset. The Court agreed that in those circumstances, damages cannot be assessed properly until the extent of the occupation, an uncertainty known to both the United States and the condemnee from the start, is ascertained. That is not the case here. The taking was not for an uncertain period; the United States asserted its prohibition without qualification in 1976.

Finally, plaintiffs cite *Nemmers v. City of Dubuque*, 764 F.2d 502 (8th Cir.1985) to show that courts have taken subsequent action into account. There, in the face of the court's determination that the rezoning of Nemmers' industrial property to residential constituted a taking, the city agreed to reinstate the prior zoning. The parties then agreed that the appropriate measure of just compensation was the interest that would have accrued on the difference between the fair market values of the property under the different zoning classifications for the period during which it was classified improperly. It is difficult to understand plaintiffs' reliance on *Nemmers* because at oral argument they insisted that "regulatory takings" law (of which zoning cases are part) has no application to this case and stated in their brief that "the identical method would be simplistic and inappropriate in the present case."

The proper test of the just compensation owed plaintiffs is the fair market value of the property on the date of taking with interest thereon for the period that just compensation has remained unpaid. To the extent plaintiff accepted the return of the property in January 1982, in partial payment therefor, it also becomes necessary to value the property received on the later date. Since neither party has produced evidence as to the value on either date, the court is unable to enter judgment at this time.

The parties are directed to notify the court within 30 days as to whether they can arrive at a stipulation of such fair market values. If they are unable to do so, they are ordered to notify the court of the additional proceedings necessary to arrive at such values and proposed dates therefor.