**YUBA NATURAL RESOURCES, INC.,**
**Plaintiff–Appellant,**

v.

**The UNITED STATES,**
**Defendant/Cross–Appellant.**

No. 89–1591.

United States Court of Appeals, Federal Circuit.

June 6, 1990.

Rehearing Denied July 6, 1990.

---

John J. Dacey, of Goldstein, Barceloux & Goldstein, San Francisco, Cal., argued for plaintiff-appellant. Of counsel were Burton J. Goldstein and Janet A. Econome.

M. Alice Thurston, of the Dept. of Justice, Washington, D.C., argued for defendant/cross-appellant. With her on the brief were George W. Van Cleeve, Acting Asst. Atty. Gen., Glen R. Goodsell, and Dirk D. Snel.

Before MARKEY, Chief Judge, FRIEDMAN, Senior Circuit Judge, and NIES, Circuit Judge.

FRIEDMAN, Senior Circuit Judge.

The issue in this case, here on appeal from the United States Claims Court, is whether that court correctly calculated the amount the appellant Yuba Natural Resources, Inc. ("Yuba"), is entitled to receive as just compensation for the temporary taking of its mineral rights in certain land. The Claims Court based its award on the amount Yuba would have received as rent and minimum royalties during the taking period under a proposed joint venture agreement with the appellant Placer Service Corporation ("Placer"), and rejected Yuba's claim that the proper measure of damages was the income Yuba would have realized under the joint venture from gold-mining operations that Placer would have conducted on the land. We affirm.

I

A. In 1905, Yuba acquired by quitclaim deed the mineral rights in a tract of land (the " '442") that the United States owned in fee.

Yuba mined the tract for gold continuously until 1968, by which time, most, if not all, of the tract had been dredged at least once, and in some areas as many as five or six times. Yuba ceased mining in 1968 because the price of gold made mining unprofitable.

Also in 1968, because of some question about possible expiration of its rights, Yuba began a correspondence with the Army Corps of Engineers ("Corps") to ascertain "what steps should be taken by Yuba in order to obtain the mining rights" to this land. In 1969, the Corps responded that the title to lands in that area was being studied and that "dredging rights on [the '442] tract must be withheld until all studies in that area have been completed and the plan has been submitted and approved by the Chief of Engineers."

Because of the low price of gold, Yuba made no effort to resume dredge mining in the tract from 1968 to 1975. It maintained the property, as well as one of its dredges (dredge 21), and derived income from gravel sales, land sales, fishing permits, and sightseeing.

In April 1975, when the price of gold had risen substantially, Yuba started up dredge 21 on its property in an area northeast and outside the '442.

At that time Yuba lacked both the money and the expertise to conduct mining operations alone. Yuba then explored with a number of companies their interest in undertaking a joint venture or partnership with regards to mining the property. Only one, Placer, evidenced interest. In August 1975, Yuba and Placer began negotiations which resulted in a proposed joint venture agreement which Placer submitted to Yuba in March of 1976. As the Claims Court found in an earlier decision, at that time, "Yuba and Placer had reached substantial agreement on the terms of [the] joint venture." *Yuba Natural Resources, Inc. v. United States*, 10 Cl.Ct. 486, 491 (1986).

The detailed agreement took the form of a lease by Yuba to Placer "for mining purposes only" of Yuba's interest in specified real property, including the '442. The agreement provided that Placer would immediately pay Yuba rent of $25,000 for the right to investigate for six months the possibilities of successful mining. This "evaluation period" could be extended for two successive three-month periods for additional rent. At the end of the evaluation period, Placer could purchase dredges from Yuba for $1,450,000 or it could terminate the agreement without further cost, Yuba keeping the rent it had already received. The agreement required Placer to complete within two years after the evaluation period the equipping work necessary to begin mining.

The agreement further provided that Placer would pay Yuba certain minimum royalties during the time of mining and if the equipping period should exceed two years. In addition to the foregoing amounts, Placer would pay Yuba royalties of four percent of net sales for the first four years of mining, and six percent of net sales for the remainder.

If, after six years, Placer had not commenced mining, Yuba could terminate the agreement and retain all amounts received.

In an April 1975 letter, the Corps informed Yuba that the United States "does have valid interests in portions of the lands upon which you are apparently conducting your gold mining activities, as well as lands upon which you apparently plan to conduct future operations.... You are further notified that you will be held accountable for any removal of precious metals, sand, gravel, and other materials which may legally be the property of the United States." In a letter dated April 9, 1976, the Corps stated that the '442 tract is "owned outright in fee by the United States ... with no reservations in the title. Dredging activity or removal of any material, including precious metals is prohibited." As a result of this latter letter, Yuba and Placer did not execute the joint venture.

On January 29, 1982, after Yuba was successful in a quiet title action, the government withdrew its April 9, 1976 letter.

B. In 1980, Yuba and Placer filed suit against the United States in the Claims Court, alleging that the government had taken their mineral rights under the Fifth Amendment, and seeking just compensation.

In 1983, the Claims Court granted summary judgment in favor of the government on the ground that no taking had occurred because the United States acted in good faith in its proprietary rather than in its sovereign capacity to protect what it deemed to be its own property, and the government neither took possession of the property nor physically barred plaintiffs from its use. *Yuba Goldfields, Inc. v. United States*, 1 Cl.Ct. 421 (1983). On appeal, this court reversed and remanded for trial to determine, on a complete record, whether there was a taking. *Yuba Goldfields, Inc. v. United States*, 723 F.2d 884, 891 (Fed.Cir.1983).

After a trial, at which evidence was introduced regarding the amount of gold that would have been mined and its putative market value at that time, *see Yuba Natural Resources, Inc. v. United States*, 10 Cl.Ct. 486, 497 (1986), the Claims Court determined that there had been a permanent taking. *Id.* at 498.

In the second appeal, we again reversed. We held that the mineral rights in the '442 tract had been temporarily taken by the government from the time of the Corps' April 9, 1976 letter to Yuba until the government withdrew that letter on January 29, 1982. *Yuba Natural Resources, Inc. v. United States*, 821 F.2d 638, 641–42 (Fed.Cir.1987). We remanded the case for a determination of damages.

On the second remand, the Claims Court awarded Yuba damages of $580,555.40 plus interest. This, the court calculated, was the minimum amount in rent and royalties that Yuba would have received under the joint venture agreement covering the almost six-year period for which the government had taken Yuba's property. *Yuba Natural Resources, Inc. v. United States*, No. 460–80L, slip op. at 7 (Cl.Ct. Mar. 9, 1989) [hereinafter "Order of Mar. 9, 1989"].

The court stated: "The law is well-settled that the measure of just compensation for a temporary taking is the fair rental value of the property taken for the period involved." *Id.* at 3. The court rejected Yuba's contention that "just compensation consists of the difference in value of the gold during the taking period compared to the value of that gold subsequently," because

> [j]ust compensation for a temporary taking does not take into account the fair market value of the property either before or after it is taken. Indeed, the property was not taken in a permanent sense, as if it had been involuntarily sold to the Government. Rather, the Government's actions in the context of a temporary taking amount to the taking of a leasehold interest for a set period of time. Thus, compensation is satisfied by the payment of fair rental value.

*Id.* at 4–5. The court ruled that the provisions of the joint operating agreement specifying the rent and minimum royalties to be paid

> constitutes *evidence* of what a reasonable lessee would have agreed to pay Yuba in rent for a 6–year period. Reviewing the proposal as a whole, it appears that the parties envisioned that Placer would pay Yuba the equivalent of $25,000 on a quarterly basis. Thus, considering that the taking was for a period just short of 6 years, of precisely 23 quarters and 20 days, a lessee would have paid Yuba $575,000 plus daily rent for 20 days of $277.77 a day, or $5,555.40. The total rent for the taking period would have amounted to $580,-555.40.

*Id.* at 7 (emphasis in original, footnote omitted).

The court previously had refused to reconsider an earlier decision, made when the court had erroneously held that the taking was permanent, that Placer had no standing to participate in the case. It stated: "The Joint Venture Agreement of October 15, 1979, between Placer and Yuba fully defines Placer's property rights in the event of a taking. Since the language of the agreement clearly terminates Placer's mineral rights to the extent of a taking, during the temporary taking period, Placer did not have a compensable property interest in the minerals." *Yuba Natural Resources, Inc. v. United States*, No. 460–80L, slip op. at 18–19 (Cl.Ct. Feb. 28, 1989).

## II

■■■ A. Normally, the proper measure of just compensation for the government's permanent taking of private property is "the fair market value of [the] property at the time of the taking." *See, e.g., Almota Farmers Elevator & Warehouse Co. v. United States*, 409 U.S. 470, 474, 473–74, 93 S.Ct. 791, 794, 794–95, 35 L.Ed.2d 1 (1973). In the case of a temporary taking, however, since the property is returned to the owner when the taking ends, the just compensation to which the owner is entitled is the value of the use of

the property during the temporary taking, *i.e.*, the amount which the owner lost as a result of the taking. *First English Evangelical Lutheran Church v. Los Angeles*, 482 U.S. 304, 319, 107 S.Ct. 2378, 2388, 96 L.Ed.2d 250 (1987) ("Where this burden results from governmental action that amounted to a [temporary] taking, the Just Compensation Clause of the Fifth Amendment requires that the government pay the landowner for the value of the use of the land during this period."). The usual measure of just compensation for a temporary taking, therefore, is the fair rental value of the property for the period of the taking. *See, e.g., Kimball Laundry Co. v. United States*, 338 U.S. 1, 7, 69 S.Ct. 1434, 1438, 93 L.Ed. 1765 (1949) ("[T]he proper measure of compensation [in a temporary takings case] is the rental that probably could have been obtained...."). *See also United States v. Petty Motor Co.*, 327 U.S. 372, 66 S.Ct. 596, 90 L.Ed. 729 (1946); *United States v. General Motors Corp.*, 323 U.S. 373, 65 S.Ct. 357, 89 L.Ed. 311 (1945).

■ The record in this case contains no expert testimony regarding the amount of rent for the six-year period a willing lessor and a willing lessee would have agreed upon. *Cf. United States v. 50 Acres of Land*, 469 U.S. 24, 30, 105 S.Ct. 451, 455, 83 L.Ed.2d 376 (1984) ("In this case, however, the testimony at trial established a fairly robust market for sanitary landfill properties, ..., and the jury's determination of the fair market value of the condemned landfill facility is adequately supported by expert testimony concerning the sale prices of comparable property."). The Claims Court, however, correctly concluded that in these circumstances "the best evidence of free bargaining between Yuba and a prospective lessee is the proposed joint venture agreement submitted to Yuba by Placer in March of 1976." *Yuba Natural Resources*, Order of Mar. 9, 1989, at 6. The Claims Court found, and Yuba does not challenge the finding, that when Placer submitted the proposed agreement to Yuba, the parties "had reached substantial agreement on the terms of" the joint venture. Accordingly, the detailed provisions in the proposed agreement governing the rent and minimal royalties to be paid under the agreement reflected the agreement of Placer and Yuba on that issue.

Yuba does not challenge the Claims Court's calculation that the total minimum amount of rent and royalties that Placer would pay Yuba under these provisions was $580,555.40. The court correctly concluded that this amount constituted the "fair rental value" of Yuba's property that the government temporarily took. That amount, therefore, with the interest the Claims Court awarded, was the proper measure of just compensation for the government's temporary taking.

B. Yuba argues, however, that it is entitled not just to the fair rental value of the property, but also to the difference between the value of the gold that Placer allegedly would have extracted during the period of the taking and the lower value of the gold after the taking ended and the gold could be mined. The price of gold had increased substantially during the taking period and had dropped significantly thereafter.

■ It is a well settled principle of Fifth Amendment taking law, however, that the measure of just compensation is the fair value of what was taken, and not the consequential damages the owner suffers as a result of the taking. *Kimball Laundry*, 338 U.S. at 7, 69 S.Ct. at 1438 (Rejecting argument that just compensation for a temporary taking should be measured by "the difference between the market value of the fee on the date of the taking and its market value on the date of its return."); *General Motors*, 323 U.S. at 380, 65 S.Ct. at 360 ("[T]hat which is taken or damaged is the group of rights which the so-called owner exercises in his dominion of the physical thing, and that damage to those rights of ownership does not include losses to his business or other consequential damage." (footnote omitted)).

■ In the present case, Yuba's claim for the difference in the value of the gold during the taking period and after the taking is precisely the kind of claim for consequential damages—here, lost profits—that

is not an appropriate element of just compensation for the temporary taking of property.

Yuba argues, however, that the following language in *Kimball Laundry* supports its position:

[W]hen the property is of a kind seldom exchanged, it has no "market price," and then recourse must be had to other means of ascertaining value, including even value to the owner as indicative of value to other potential owners enjoying the same rights. These considerations have special relevance where "property" is "taken" not in fee but for an indeterminate period.

338 U.S. at 6, 69 S.Ct. at 1438 (citation omitted).

Yuba argues that the property the government here temporarily took—precious metals interests—is the kind of property "seldom exchanged," and therefore that the fair rental value of the property was not a proper measure of just compensation. There are two answers to this contention.

First, even though the property interest the government here temporarily took may "seldom [be] exchanged," the joint venture agreement provided clear and convincing evidence of the fair rental value of the property.

Second, in *Kimball Laundry* the government temporarily took an existing business—an operating laundry—and continued to operate the laundry for its own purposes. For that reason, the Court held that one element of the just compensation to which the laundry owner was entitled was whatever "demonstrable loss of going-concern value" the taking caused. 338 U.S. at 15, 69 S.Ct. at 1442. In this case, however, there was no existing business or going concern that the government took. There was only a proposed agreement which, had there been no taking, presumably ultimately would have developed into an existing mining operation. Even that was not certain, however, since under the joint venture agreement, Placer could have terminated the agreement after two years, and Yuba had the right to terminate the agreement if Placer did not begin mining within six years.

Yuba relies on *Foster v. United States*, 2 Cl.Ct. 426 (1983), *aff'd*, 746 F.2d 1491 (Fed. Cir.1984), *cert. denied*, 471 U.S. 1053, 105 S.Ct. 2112, 85 L.Ed.2d 478 (1985), where it asserts the court ignored the rental value of the taken property, and instead awarded "the value of the 'operator's interest' or the fair market value of the minerals at the date of the taking by a detailed analysis of a capitalization of income approach." *Foster*, however, involved a permanent and not a temporary taking, and therefore the court was required to determine the fair market value of the property—a process that did not require determination of fair rental value.

C. Alternatively, Yuba argues that if the joint venture agreement is the proper basis for determining the fair rental value of the property, Yuba also should have received the additional royalties of four percent and six percent of the net sales of the gold that would have been extracted during the taking period, as the agreement provided.

Yuba did not make this argument during its lengthy and detailed initial presentation of its case before the Claims Court. The contention first appeared in Yuba's "Motion to Reconsider the [Claims] Court's Opinion and Judgment." This contention was one of six points raised in the motion. Yuba argued that "in order to properly ascertain the amounts which would have been due YUBA under the proposed agreement, consideration should also be given to the amount of gross gold sales during the taking period. As the evidence at trial clearly established, the total gross gold sales, as summarized [in] plaintiffs' exhibit 52 under the column Gold Sales Value, would have been (a) $34,969,000, pursuant to plaintiffs' net value analysis, (b) $49,-136,000 pursuant to the case A analysis, and (c) $61,999,000 pursuant to case B analysis."

The Claims Court denied the motion "for lack of merit."

The decision whether to grant reconsideration lies largely within the discretion of the district court. *Cf. Gelco Builders & Burjay Constr. Corp. v. United States*, 369 F.2d 992, 1000 n. 7, 177 Ct.Cl. 1025 (1966). *See also Van der Salm Bulb Farms, Inc. v. Hapag Lloyd, AG*, 818 F.2d 699, 700 (9th Cir.1987) ("This court construes a denial of a motion for reconsideration under Fed.R.Civ.P. 59(e) as one denying relief under Fed.R.Civ.P. 60(b) and will not reverse absent an abuse of discretion."). We cannot say that, considering all the circumstances, the Claims Court abused its discretion in denying reconsideration and rejecting Yuba's belated attempt to inject this new theory of damages into the case. Moreover, any attempt to determine how much gold would have been extracted during the taking period, and what its net sales price would have been, would involve the very kind of conjectural and speculative analysis the courts consistently reject as a basis for determining just compensation under the Fifth Amendment.

D. Finally, Yuba contends that in any event it is entitled to recover the additional expenses of $477,240 it incurred in moving a dredge during the taking period. Apparently the parties intended to use the dredge in the joint venture, but Yuba moved the dredge to use it elsewhere after the temporary taking frustrated the joint venture.

Yuba's cost of moving the dredge, like the lost profits discussed above, are consequential damages that are not recoverable as part of just compensation for a temporary taking. The Supreme Court dealt with a similar contention in *General Motors*, 323 U.S. at 383, 65 S.Ct. at 361–62. There the government condemned, for a short term, portions of a warehouse building that General Motors occupied under a long-term lease. The Court held that "the reasonable cost of moving out the property stored and preparing the space for occupancy by the subtenant" could "be proved, not as independent items of damage but to aid in the determination of what would be the usual—the market—price which would be asked and paid for such temporary occupancy of the building then in use under a long-term lease." *Id.*

Here, Yuba makes no claim that the cost of moving the dredge would have been considered in determining the fair rental value of the mineral rights. *General Motors* teaches that such cost is not itself an "independent item[ ] of damage" in a temporary taking case.

### III

Placer contends that the Claims Court erroneously denied it standing as a party to this suit. Yuba and Placer have told us that they already have agreed between themselves upon the division of whatever just compensation is awarded. They also state that permitting Placer to participate as a party in the case would not increase the total damages to be awarded; they state in their brief that they seek only "to be fully compensated for what was taken."

In these circumstances, any issue with respect to Placer's standing to participate in this suit is moot, and there is no occasion for us to decide it. The property the government took was that of Yuba, and the amount of just compensation to which Yuba is entitled is not affected by the identity of the companies that will share the award.

### CONCLUSION

The judgment of the United States Claims Court is

AFFIRMED.