Herman **CORN**, Trustee, Plaintiff,

v.

**CITY OF LAUDERDALE LAKES, et al., Defendants.**

No. 84–6034–CIV.

United States District Court, S.D. Florida.

Aug. 30, 1991.

Andrew Lavin, Romanik and Lavin, Hollywood, Fla., for plaintiff.

Michael Mattson, Conrad, Scherer and James, Fort Lauderdale, Fla., for defendants.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

PAINE, District Judge.

This matter comes before the Court following a four-day non-jury trial held August 12–15, 1991.

### I. Findings of Fact

#### Background

1. Prior to June 1966, Plaintiff, HERMAN CORN, TRUSTEE ("CORN"), acquired 261 acres of real property located in the unincorporated area of Broward County and then zoned for agricultural uses (the "Parcel").

2. After preliminary negotiations with Defendant CITY OF LAUDERDALE LAKES (the "CITY") concerning possible annexation of the Parcel, CORN presented a proposed development plan.

3. On July 12, 1966, the CITY adopted three ordinances:

a. Ordinance 103 created a C–1A zoning category within the CITY, incorporating the permissible uses of the pre-existing category C–1 and requiring the submission of a site development plan before issuance of a building permit;

b. Ordinance 104 formally annexed the Parcel; and

c. Ordinance 105 designated various zoning classifications for different portions of the Parcel, including a C–1A designation for an approximately 8½ acre portion bounded to the south by Canal C–13 and to the east by U.S. 441 (the "Property"). The land immediately north and west of the Property was concurrently zoned for residential use.

4. The uses permitted in zoning category C–1 included fertilizer sales, animal boarding kennel, automobile paint shop, storage warehouse, railroad freight or passenger station, and sheet metal shop.

5. Between 1966 and 1977, CORN developed much of the Parcel in accordance with the plan originally submitted to the CITY. As part of this development, CORN constructed waterways along the north and west boundaries of the Property, to form a buffer between it and adjacent residential areas.

6. CORN spent in excess of $100,000.00 preparing the Property to be developed, although it is not clear whether this money was directed toward general commercial preparation or a specific intended use.

7. During 1975, the CITY retained the services of a land use planner, who questioned the propriety of C–1A zoning for the Property. No formal action, however, was taken with respect to changing the zoning classification of the Property until July 12, 1977.

8. On April 1, 1977, CORN submitted a preliminary site plan (the "Site Plan") for development of the Property. The site plan depicted the construction of an approximately 67,000 square foot shopping center on the eastern portion of the Property, which would front U.S. 441, and an approximately 103,000 square foot mini-warehouse on the western, or rear, portion.

9. Many CITY residents publicly opposed the CORN project.

10. On May 12, 1977, the CITY's Planning and Zoning Board recommended approval of the Site Plan to the City Council, the body authorized to make a final decision thereon. At the request of the City Council, the Planning and Zoning Board again considered the Site Plan at a public meeting held May 26, 1977. By letter dated May 27, 1977, the Planning and Zoning Board re-affirmed its May 12 recommendation of approval.

11. At public meetings held May 31, June 14, and June 21, 1977, the City Council tabled consideration of the Site Plan.

12. On July 12, 1977, the City Council for the first time discussed changes in both the uses permitted within C–1A property and the zoning classification of CORN's Property. The City Council in fact passed two ordinances on first reading that were ultimately adopted:

a. Ordinance 548 amended Article XXXVII, Section 37.2 of the Broward County Zoning Classification Restrictions and Regulations, as adopted by reference, to eliminate storage warehouses as a permitted use in category C–1, and consequently category C–1A; and

b. Ordinance 549 rezoned the Property from C–1A to B–3, a more restrictive category.

13. After passing Ordinances 548 and 549, the City Council voted unanimously to deny approval of CORN's Site Plan. There was no discussion of what modifications would make the plan acceptable.

14. Ordinance 552, which imposed a 150–day building moratorium on all C–1 property in the CITY, was proposed at the July 12, 1977 meeting and later adopted. The stated purpose of the moratorium was to permit the Planning and Zoning Board, which had purportedly advised that C–1 property abutting residential property should be rezoned, to review the CITY's commercial zoning scheme.

15. Prior to July 12, 1977, the City Council made no attempt to investigate mini-warehouses or compare the traffic, noise, and other adverse effects allegedly created by mini-warehouses with those created by any other type of use still permitted under zoning category C–1, as amended, or category B–3. Its actions were, instead, motivated by a desire to thwart CORN's proposed project.

16. CORN sued these same Defendants in the Circuit Court of the Seventeenth Judicial Circuit in and for Broward County, Florida, Case No. 77–12955 (the "State Court Action"), seeking, *inter alia*, a writ of mandamus directing the City Council to approve the Site Plan, a judicial declaration that Ordinances 548, 549, and 552 were invalid, and monetary damages for inverse condemnation. Upon a defense motion, the inverse condemnation claim was voluntarily dismissed.

17. Ordinance 568 extended the building moratorium through July 4, 1978.

18. On October 20, 1978, following a three-day non-jury trial, Circuit Judge Frank A. Orlando entered Final Judgment, concluding that CORN's conduct in reliance upon the C–1A status of his Property since 1966 created vested rights, which the CITY was equitably estopped to deny. Judge Orlando therefore declared Ordinances 548, 549, and 552 void and unenforceable against CORN or the Property, and directed the CITY to approve the Site Plan, then issue a building permit, upon correction of three technical deficiencies.

19. The Final Judgment was stayed pending appeal to the Fourth District Court of Appeal.

20. A dispute arose regarding the need for, and proper amount of, a supersedeas bond on appeal. CORN submitted a pleading entitled "Damage Summary" that stated "[w]e have a commitment from Coral Gables Federal Savings & Loan Assn. to borrow 80% of total costs at 10.5211% interest for 24 years," then projected his potential damages as including increased loan costs and increased closing costs.

21. A seventy-five percent (75%) loan-to-value ratio, leaving the owner with twenty-five percent (25%) equity, was customary in the banking industry for construction loans in 1977.

22. On February 16, 1983, in *City of Lauderdale Lakes v. Corn*, 427 So.2d 239 (Fla. 4th Dist.Ct.App.1983) ("*Corn I*"), the Fourth District Court of Appeal upheld the trial court's application of the doctrine of equitable estoppel and the propriety of mandamus, thereby affirming the Final Judgment. The appellate court issued a mandate on March 4, 1983, at which time its opinion became final.

23. During October 1983, seven months after the appellate mandate, CORN submitted a revised site plan (the "Revised Site Plan") to the CITY for approval. No explanation was offered for the seven-month delay.

24. The City Council refused to approve the Revised Site Plan unless CORN platted the Property, citing a Broward County platting requirement imposed after July 1977.

25. On January 17, 1984, CORN filed the instant action (the "Federal Court Action"), seeking damages under 42 U.S.C. § 1983 [1] for violation of civil rights granted under the takings clause of the Fifth Amendment,[2] the due process clause of the Fourteenth Amendment,[3] and the equal protection clause of the Fourteenth Amendment.

26. Among the items of damage specified in each Count of the Complaint were "increased financing and interest charges as a result of the delay in construction" of the project.

27. On October 26, 1984, a full year after submitting the Revised Site Plan, CORN filed a Motion to Enforce Final Judgment in the State Court Action, asserting that, because the CITY should have approved the Site Plan as submitted in 1977, the subsequent platting requirement

---

1. 42 U.S.C. § 1983 provides, in pertinent part: Every person who, under color of [state law], subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

2. "[P]rivate property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V.

3. "No State shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend XIV.

did not apply. Again, CORN offered no explanation for the one-year delay.

28. On March 26, 1985, Judge Estella M. Moriarty, the successor to Judge Orlando's division, entered an Order on Plaintiff's Motion to Enforce Final Judgment, concluding that CORN was entitled to issuance of a building permit without platting the Property.

29. CORN chose, however, not to pursue development of the Property.

30. On October 22, 1985, United States District Judge Jose A. Gonzalez, Jr. dismissed this Federal Court Action as not ripe under *Williamson County Regional Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985). In *Corn v. City of Lauderdale Lakes*, 816 F.2d 1514 (11th Cir.1987) (*"Corn II"*), the Eleventh Circuit Court of Appeals reversed the dismissal.

31. The undersigned later held that CORN's cause of action was not barred by the statute of limitations or res judicata. In *Corn v. City of Lauderdale Lakes*, 904 F.2d 585 (11th Cir.1990) (*"Corn III"*), the Eleventh Circuit affirmed this holding.

32. CORN remains the owner of the Property, which has not been developed.

33. CORN dismissed BEN EIGNER as a Defendant prior to the instant trial.

34. CORN likewise dismissed Counts III and IV, proceeding to trial on Counts I (a takings claim) and II (a substantive due process claim).

### Wheeler IV Factors

The parties acknowledged, and the Court ruled (DE 196), that any damages for a temporary regulatory taking of property must be awarded in accordance with *Wheeler v. City of Pleasant Grove*, 896 F.2d 1347 (11th Cir.1990) (*"Wheeler IV"*). As discussed *infra*, *Wheeler IV* requires the Court to determine (i) the fair market value of the subject property under various circumstances, (ii) the landowner's equity in a proposed project, (iii) the length of the temporary taking, and (iv) the market rate of return during this period.

35. Ronald Ames, an expert retained by CORN, valued the Property as developed and as restricted on nine separate valuation dates. The parties have stipulated that the values for the Property *as developed* are correct for purposes of this litigation. The CITY objects, however, to the methodology used to value the Property as restricted. Specifically, Mr. Ames assigned values to both the front and rear portions of the Property based upon a direct sales comparison approach, then adjusted these values downward. Between 1977 and 1983, Mr. Ames reduced the value by one-half (½) due to a perceived atmosphere of hostility toward development within the CITY that grew from the July 12, 1977 ordinances and an alleged incident involving property owned by J.C. Penney. From 1983 to 1985, Mr. Ames reduced the value by one-third (⅓) due primarily to the assumption that the project intended in 1977 was no longer feasible.

The Court finds that the *unadjusted* figures more accurately represent the fair market values of the Property as restricted, particularly between 1977 and 1983. While any appraisal necessarily includes some degree of speculation, Mr. Ames' fifty percent (50%) reduction based upon "hostility" to development crosses the line into sheer guesswork. Moreover, *Wheeler IV* does not authorize a reduction in the value of restricted land for public perceptions that may have been created by passing the subsequently invalidated ordinance. The raw direct sales comparison figures, absent Mr. Ames' speculation, are the most credible evidence of value in the record.

Mr. Ames valued the Property as of July 12, 1977, when the Site Plan was rejected, July 1 of each year from 1978 through 1984, and March 26, 1985, when the Order on Plaintiff's Motion to Enforce Final Judgment was entered. No valuations were made for July 4, 1978, when the moratorium expired, or March 4, 1983, when the Fourth District Court of Appeals affirmed the Final Judgment by mandate. From the evidence presented, the Court finds that the values on these dates had not changed from Mr. Ames' last preceding valuation date.

In summary, the Court finds the fair market values of the Property to be as follows:

| Date | Value-WH | Value-SC | Value-Raw | Value-Bck |
|---|---|---|---|---|
| 7-12-77 | $2,020,000 | $2,600,000 | $860,000 | $253,000 |
| 7- 1-78 | 2,070,000 | 2,750,000 | 860,000 | 253,000 |
| 7- 4-78 | 2,070,000 | 2,750,000 | 860,000 | 253,000 |
| 7- 1-79 | 2,210,000 | 2,850,000 | 1,360,000 | 425,000 |
| 7- 1-80 | 2,320,000 | 2,900,000 | 1,360,000 | 425,000 |
| 7- 1-81 | 2,570,000 | 2,950,000 | 1,360,000 | 425,000 |
| 7- 1-82 | 2,750,000 | 3,100,000 | 1,360,000 | 425,000 |
| 3- 4-83 | 2,750,000 | 3,100,000 | 1,360,000 | 425,000 |
| 7- 1-83 | 2,750,000 | 3,150,000 | 1,850,000 | 916,000 |
| 7- 1-84 | 2,810,000 | 3,150,000 | 1,850,000 | 916,000 |
| 3-26-85 | 2,850,000 | 2,800,000 | 2,220,000 | 1,287,000 |

Value-WH = value of that portion of the Property upon which CORN intended to build a mini-warehouse facility if the project were complete

Value-SC = value of portion upon which CORN intended to build a shopping center if complete

Value-Raw = value of total Property as restricted

Value-Bck = value of back portion as restricted

36. As indicated during trial, the Court interprets *Wheeler IV* as requiring a fact-specific determination of the landowner's equity, rather than a reflexive application of the industry standard, whenever possible. Herman Corn and Stephen Corn testified that CORN intended to build the mini-warehouse and shopping center entirely for cash. The Court rejects this testimony as not credible, particularly in light of the Damage Summary filed in the State Court Action and the Complaint herein, each of which refers to financing. In the absence of any evidence regarding the construction costs of the proposed project or a specific loan-to-value ratio contemplated by CORN, the Court will apply the customary seventy-five percent (75%) loan-to-value ratio.

37. The parties presented conflicting, and somewhat complex, testimony as to the appropriate rates of return during the applicable timeframe. The Court finds the testimony of H.J. Alexandrowicz most persuasive, and will employ the rates of return that he determined between 1977 and 1983. For the remaining two years, which Mr. Alexandrowicz did not address, the interest rate for 90-day Treasury Bills ("T-Bills") will be used. Thus, the market rates of return were as follows:

| Date | Rate of Return |
|---|---|
| 7-12-77 | 8.88% |
| 7- 1-78 | 8.88% |
| 7- 4-78 | 8.88% |
| 7- 1-79 | 9.12% |
| 7- 1-80 | 9.13% |
| 7- 1-81 | 9.47% |
| 7- 1-82 | 9.08% |
| 3- 4-83 | 9.08% |
| 7- 1-83 | 8.50% |
| 7- 1-84 | 9.60% |
| 3-26-85 | 7.50% |

---

38. Prejudgment interest at the rate paid on 90–day T-Bills, compounded annually, is properly added to any damages awarded herein. *See Front Royal and Warren County Industrial Park Corp. v. Town of Front Royal,* 749 F.Supp. 1439, 1448 & n. 14 (W.D.Va.1990). The T-Bill rates between 1977 and 1991 were as follows:

| Date | Rate |
|------|------|
| 1977 | 5.30% |
| 1978 | 7.20% |
| 1979 | 10.00% |
| 1980 | 11.50% |
| 1981 | 14.10% |
| 1982 | 10.70% |
| 1983 | 8.50% |
| 1984 | 9.60% |
| 1985 | 7.50% |
| 1986 | 6.00% |
| 1987 | 5.80% |
| 1988 | 6.70% |
| 1989 | 8.80% |
| 1990 | 8.10% |
| 1991 | 6.14% |

## II. Conclusions of Law

### Liability

#### a. Individual Defendants

Neither the Pretrial Stipulation (DE 149), Plaintiff's Trial Memorandum, nor his proposed Findings of Fact and Conclusions of Law makes any mention of the individual Defendants' liability for damages under 42 U.S.C. § 1983. The issue was likewise ignored during trial. CORN has apparently abandoned this portion of the claim. Alternatively, CORN has failed to meet his burdens of production and proof in this regard. Judgment will be entered in favor of Defendants HOWARD CRAFT, ALFONSO GEREFFI, JEROME J. COHAN, MORRIS KLEIN, LYMAN L. ALLEN, LOUIS GREENWALD, and HARRY KAUFMAN.

#### b. The CITY

A taking may be physical, where a public entity enters upon private land, or regulatory, where a public ordinance invalidly restricts the landowner's private uses. See First English Evangelical Lutheran Church of Glendale v. County of Los Angeles, 482 U.S. 304, 329–30, 107 S.Ct. 2378, 2393–94, 96 L.Ed.2d 250 (1987) (Stevens, J., dissenting). There are four distinct types of constitutional challenges to zoning ordinances. A plaintiff may assert that the regulation:

1. has taken his property without just compensation in contravention of the Fifth Amendment (a "just compensation"

claim);[4]

2. goes so far and destroys the value of his property to such an extent that it has the same effect as a taking by eminent domain (a "due process takings" claim);

3. is arbitrary and capricious, bearing no substantial relation to the public health, safety, morals, or general welfare, and is therefore an invalid exercise of the police power (an "arbitrary and capricious due process" or "substantive due process" claim); or

4. denies equal protection (an "equal protection" claim).

*Eide v. Sarasota County,* 908 F.2d 716, 720–22 (11th Cir.1990). CORN has raised a just compensation claim[5] and a substantive due process claim.[6] The Court will first consider substantive due process, which CORN has termed his "main claim."

■■■ A violation of substantive due process under 42 U.S.C. § 1983 requires proof that (i) the plaintiff has been deprived of a federal constitutionally protected interest, and (ii) the deprivation resulted from an abuse of governmental power sufficient to raise an ordinary tort to the stature of a constitutional violation. *Rymer v. Douglas County,* 764 F.2d 796, 801 (11th Cir.1985). A substantive due process claim, unlike a just compensation claim, does not require denial of *all* reasonable use of the property; it is sufficient that the government has arbitrarily interfered with the owner's right to a particular use. *See, e.g., Greenbriar, Ltd. v. City of Alabaster,* 881 F.2d 1570, 1576 n. 11 (11th Cir.1989).

i. *Deprivation of Property Interest*

■■ The State Court Action established that CORN had acquired vested rights in the zoning that existed before July 12,

1977. This issue, having been presented, fully litigated, and resolved in a prior suit between these parties, cannot be relitigated. *Krug v. Meros,* 468 So.2d 299, 302 (Fla. 2d Dist.Ct.App.), *review denied,* 480 So.2d 1295 (Fla.1985); *see also Allen v. McCurry,* 449 U.S. 90, 96, 101 S.Ct. 411, 415, 66 L.Ed.2d 308 (1980) (collateral estoppel in § 1983 claim determined by state law).[7]

■■ The question becomes whether CORN's vested rights rise to the level of a constitutionally protected property interest. State law creates and defines the parameters of a plaintiff's property interests. *Paul v. Davis,* 424 U.S. 693, 709, 96 S.Ct. 1155, 1164, 47 L.Ed.2d 405 (1976); *Bd. of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). "Mere abstract need or desire for a benefit will not create a protectible property interest; instead there must be a *legitimate claim of entitlement* to the expected benefit." *Spence v. Zimmerman,* 873 F.2d 256, 258 (11th Cir.1989) (citing *Roth,* 408 U.S. at 577, 92 S.Ct. at 2709) (emphasis added).

The CITY, citing both *Marine One, Inc. v. Manatee County,* 877 F.2d 892, 894 (11th Cir.1989) (*"Marine One I"*), and *Mackenzie v. City of Rockledge,* 920 F.2d 1554, 1559 (11th Cir.1991), argues that Florida law grants no property right in the possession of a building permit, nor, therefore, approval of preliminary site plans. Defendants' Trial Brief at 9. Because this line of cases is inconsistent with Eleventh Circuit precedent and has been impliedly renounced, the argument is rejected.

In *Marine One I,* a landowner sued a county and its board of commissioners, alleging that the county's rescission of permits authorizing construction of a marina

---

**4.** The takings clause applies to states and their political subdivisions through the Fourteenth Amendment. *See Wheeler v. City of Pleasant Grove,* 833 F.2d 267, 270 n. 3 (11th Cir.1987) (citing *Chicago, B. & Q.R. Co. v. City of Chicago,* 166 U.S. 226, 17 S.Ct. 581, 41 L.Ed. 979 (1897)).

**5.** CORN, citing *Eide,* 908 F.2d at 721 n. 8, suggests that the just compensation and due process takings claims are best viewed as identical. *See* Plaintiff's Trial Memorandum at 16 n. 5.

**6.** Curiously, one Eleventh Circuit Court of Appeals decision has stated that "[t]he plaintiff in *Corn* presented only a takings claim, and not a substantive due process claim." *Greenbriar, Ltd. v. City of Alabaster,* 881 F.2d 1570, 1574 n. 8 (11th Cir.1989).

**7.** Additionally, CORN presented sufficient evidence at trial of its vested rights in the prior zoning.

deprived it of property without compensation. The Eleventh Circuit Court of Appeals affirmed a judgment for the defendants notwithstanding a jury verdict, finding no constitutionally protected property interest. 877 F.2d at 894. Citing a number of Florida state cases decided in the 1970's, the court wrote:

These cases make clear that Florida law does not provide the ability to recover money damages for rescission of a permit. *Cf. Corn v. City of Lauderdale Lakes,* 816 F.2d 1514, 1517 (11th Cir. 1987) (under Florida law, exclusive remedy available to property owner challenging zoning ordinance was suit to invalidate the zoning ordinance and enjoin its enforcement). *The only right provided a permit holder under state law, then, is the right to retain the permit and invalidate any rescinding resolution once he has satisfied the requirements of equitable estoppel.* Thus, the district court correctly stated that if [plaintiff] acquired any right at all as a result of his reliance, it was a right to pursue equitable estoppel under proper circumstances.

Because [plaintiff] had this remedy available to him, if the facts would indeed support the claim, the State did not deprive him of any protectable property interest. Having failed to prove the existence of a cognizable property interest, *the claims* of both [plaintiff and his company] *must fail as a matter of law.*

877 F.2d at 895 (emphasis added).

This language suggests that, if a state does not recognize a common law action for inverse condemnation, then a landowner has no property interest for purposes of 42 U.S.C. § 1983. The landowner would therefore lack *any* opportunity to recover monetary damages, an anomalous result that is inconsistent with Supreme Court teachings. *See First English Evangelical Lutheran Church of Glendale v. County of Los Angeles,* 482 U.S. 304, 319, 107 S.Ct. 2378, 2388, 96 L.Ed.2d 250 (1987) (where government's action has worked a taking, subsequent invalidation of action does not relieve it of duty to provide compensation for period of taking).[8] Certainly, *Corn II* did not hold that a landowner has no damage action for takings effected by invalid zoning ordinances passed in Florida.[9] The court therein simply noted that, under the *Williamson County* ripeness test,[10] a Florida plaintiff was not required to seek damages in state court before filing a federal lawsuit.[11]

More importantly, as argued in a motion for rehearing, the *Marine One I* court overlooked its own recent precedent. In *A.A. Profiles, Inc. v. City of Fort Lauderdale,* 850 F.2d 1483 (11th Cir.1988), a landowner obtained a building permit for construction of a wood-chipping business after the city commission approved the use by resolution. During construction, the city rezoned the subject parcel to prevent wood-chipping. In an opinion issued just eleven months before *Marine One I,* the Eleventh Circuit held that the landowner had acquired property rights in its proposed development. 850 F.2d at 1488 (citing *Wheeler v. City of Pleasant Grove,* 664 F.2d 99

**8.** Conversely, the availability of a state inverse condemnation claim renders any federal claim premature. *Williamson County Regional Planning Comm'n v. Hamilton Bank,* 473 U.S. 172, 196–97, 105 S.Ct. 3108, 3121–22, 87 L.Ed.2d 126 (1985). Section 1983 would then have little application to takings law.

**9.** Had it done so, both *Corn III* and this trial would have been unnecessary.

**10.** In *Williamson County Regional Planning Comm'n v. Hamilton Bank,* 473 U.S. 172, 193, 196–97, 105 S.Ct. 3108, 3120, 3121–22, 87 L.Ed.2d 126 (1985), the Supreme Court held that a 42 U.S.C. § 1983 claim for money damages stemming from a regulatory taking is not ripe until the plaintiff demonstrates that (i) a final decision has been made applying the regulation to the subject property, and (ii) there is no adequate state remedy, such as inverse condemnation, available to redress the injury occasioned by the final decision. *See Corn II,* 816 F.2d at 1515–16.

**11.** State inverse condemnation proceedings are now apparently available in Florida. *See Executive 100, Inc. Martin County,* 922 F.2d 1536, 1539 (11th Cir.1991) (citing *Joint Ventures, Inc. v. Dept. of Transp.,* 563 So.2d 622, 628 (Fla. 1990). This subsequent development has no bearing on the ripeness determination in *Corn II.*

(5th Cir. Unit B 1981) ("*Wheeler I* ")[12]. "The rezoning ordinance denied appellant this property interest because the new classification did not accommodate a development like the wood-chipping operation." 850 F.2d at 1488.[13]

On rehearing, the *Marine One I* court stated a new basis for its holding:

> There is one salient feature of the instant case, however, that distinguishes it from the three cases that petitioners cite [*Wheeler I, A.A. Profiles,* and *Corn II* ]. In each of those cases, a city's application of its zoning laws to owners or *private* property was determined to constitute a taking of that property;[14] here the land upon which construction was to be permitted is *publicly-owned.* The state owns the waters and the submerged lands upon which petitioners sought to build a dock.

898 F.2d 1490, 1492 (11th Cir.1990) ("*Marine One II* ") (emphasis in original). The public/private distinction had not been mentioned in *Marine One I.* Thus "clarifying" its decision, the court denied the motion for rehearing. *Id.* at 1493.

In *Mackenzie,* 920 F.2d at 1559, a landowner sued a city, alleging that he was wrongfully denied a permit to build a marina. Citing *Marine One I,* but neither *A.A. Profiles* nor *Marine One II,* another Eleventh Circuit panel held that Florida law creates no property right in the application for, or possession of, a building permit.[15]

In sum, *A.A. Profiles* held that a Florida landowner who obtains a building permit and spends money in reliance upon existing zoning has a constitutionally protected property interest in his proposed development. The *Marine One II* opinion essentially acknowledged the strength of this holding by shifting the entire foundation of the court's prior ruling. To the extent that *Mackenzie* relies upon *Marine One I,* it is inconsistent with *A.A. Profiles* and *Marine One II.*

CORN did not, of course, secure a building permit for his mini-warehouse project. But Judge Orlando held that the CITY lacked any discretion to deny preliminary site plan approval, the prerequisite to a building permit application. The Judge in fact ordered the CITY to issue a building permit in accordance with the final site plans. The Fourth District Court of Appeals affirmed the Final Judgment in full. *Corn I,* 427 So.2d at 242. CORN thus had no less a "legitimate claim of entitlement" to proceed with his development than one possessing a permit. *See Spence v. Zimmerman,* 873 F.2d at 258 (lack of discretion to deny is key).

### ii. *Abuse of Governmental Power*

■ CORN must further prove that the CITY's actions in blocking development were arbitrary and capricious, lacking an adequate public purpose. *See Rymer,* 764 F.2d at 802 (landowner protected against arbitrary use of government power). CORN argues that collateral estoppel establishes this element as well, citing the following language from the Final Judgment:

> Further, no competent, substantial evidence was before this Court showing that these Ordinances were enacted as a

---

**12.** Decisions rendered by a Unit B panel of the former Fifth Circuit are binding precedent in the Eleventh Circuit. *Stein v. Reynolds Securities, Inc.,* 667 F.2d 33, 34 (11th Cir.1982).

**13.** The Eleventh Circuit, in another pre-*Marine One I* case involving a Florida landowner, held that

> state law creates a constitutionally protectible property interest in a building permit if (1) the municipality lacks discretion and must issue a building permit to an applicant who complies with the statutory requirements *and* (2) the applicant has fulfilled the requirements.

*Spence v. Zimmerman,* 873 F.2d 256, 258 (11th Cir.1989) (citing *Littlefield v. City of Afton,* 785 F.2d 596, 602 (8th Cir.1986)) (emphasis in original). Thus, the arbitrary denial, as well as revocation, of a building permit might violate federal constitutional rights.

**14.** Just as *Corn II* did not hold that the plaintiff lacked a damage action, neither did it determine that a taking had occurred; hence the instant trial.

**15.** Because *Mackenzie* likewise involved a marina, the court could, and perhaps should, have grounded its decision in the public/private distinction raised in *Marine One II.*

result of compelling reasons or [of?—sic] public health and safety.

Collateral estoppel, however, applies only to *"necessary and material* issues resolved in the first suit." *Seaboard Coast Line R.R. Co. v. Cox,* 338 So.2d 190, 191 (Fla.1976) (emphasis added); *see generally* 32 Fla.Jur.2d *Judgments and Decrees* § 119 (1981) (collecting cases). The State Court Action concerned vested rights and equitable estoppel, which focus on the conduct of the landowner, not the governmental entity; the theory of vested rights overrides even a valid exercise of the zoning power. *See Town of Largo v. Imperial Homes Corp.,* 309 So.2d 571, 574 (Fla.2d Dist.Ct.App.1975). Any discussion of the public health considerations underlying Ordinances 548, 549, and 552 appears to be mere dictum.

The party who claims the benefit of a former judgment bears the burden of showing its applicability. *Seaboard Coast Line R.R. Co. v. Industrial Contracting Co.,* 260 So.2d 860, 864 (Fla. 4th Dist.Ct. App.1972). Because CORN has not proven that the issue of public purpose was central to the Final Judgment, collateral estoppel does not apply.

■ Nonetheless, the Court, upon an independent review of the evidence, holds that the CITY acted arbitrarily and capriciously. The City Council expressed concern for increased traffic, noise, and other adverse effects allegedly created by mini-warehouses. Yet prior to July 12, 1977, no effort was made to investigate mini-warehouses. Moreover, the City Council targeted only the mini-warehouse use for elimination, leaving a number of uses that arguably cause more traffic, noise, and air pollution; no comparison between mini-warehouses and the remaining permitted uses was ever conducted. *See City of Kissimmee v. Ellis,* 431 So.2d 283, 285 (Fla. 5th Dist.Ct.App.1983) (city cannot prohibit proposed use that is no more obnoxious than permitted use). The moratorium seems nothing more than an attempt at *post hoc* rationalization. *See 11126 Baltimore Boulevard v. Prince George's County,* 886 F.2d 1415, 1425 (4th Cir.1989) (supporting

evidence must exist when decision made). In short, the City Council was motivated solely by an irrational desire to thwart CORN's plans.

■ The CITY takes the unusual position that, because the City Council exercised no independent judgment, but rather blindly followed the will of residents who opposed a mini-warehouse project, their actions are *per se* valid. *See* Defendants' Trial Brief at 11–12 (citing *Greenbriar, Ltd. v. City of Alabaster,* 881 F.2d 1570 (11th Cir.1989)). Indeed, one district court has held that *Greenbriar*

> clearly stands for the proposition that elected officials who vote on zoning requests can act for purely political reasons, because partisan, political decision-making, even by unknowledgable, close-minded politicians fearful of harm more than political, is automatically deemed rational and, therefore, *cannot* be arbitrary and capricious unless it is the product of corruption...."

*Church of Jesus Christ of Latter–Day Saints v. Jefferson County,* 721 F.Supp. 1212, 1214 (N.D.Ala.1989) (emphasis in original).

*Greenbriar* itself, however, merely stated that "[c]ouncil members who evaluate a proposal in light of their constituents' preferences do not *necessarily* overlook what [plaintiff] contends to be the 'merits' of a particular zoning plan," provided they "undertak[e] *their own evaluations* of the proposal." 881 F.2d at 1579–80 (emphasis added). Moreover, the appellate court in both *Wheeler I* and *A.A. Profiles* refused to accept public outcry against a project as evincing a legitimate state interest. 664 F.2d at 100; 850 F.2d at 1487–88. The City Council herein undertook no independent evaluation of the merits and acted irrationally.

Because the Court finds the CITY liable for an arbitrary and capricious due process taking, it need not consider whether the ordinances "go too far" and entitle CORN to just compensation under the Fifth Amendment. "Regardless of which constitutional provision a taking falls under, the measure of damages to which the aggriev-

ed landowner is entitled is the same." *See Wheeler v. City of Pleasant Grove*, 833 F.2d 267, 270 n. 3 (11th Cir.1987).[16]

### Damages

In *First English Evangelical Lutheran Church of Glendale v. County of Los Angeles*, 482 U.S. 304, 319, 107 S.Ct. 2378, 2388, 96 L.Ed.2d 250 (1987), the Supreme Court recognized a constitutional *right* to damages for a temporary regulatory taking, but did not articulate the proper *measure* of damages. Defendants moved for partial summary judgment (DE 152), asking that damages be limited to "the rental value of the property for the period of the alleged taking" (DE 153), the measure ordinarily applied in temporary physical takings cases. *See, e.g., Kimball Laundry Co. v. United States*, 338 U.S. 1, 7, 69 S.Ct. 1434, 1438, 93 L.Ed. 1765 (1949); *Yuba Natural Resources, Inc. v. United States*, 904 F.2d 1577, 1581 (Fed.Cir.1990). This Court denied the motion on the basis of *Wheeler IV*, which, drawing upon the Eighth Circuit decision *Nemmers v. City of Dubuque*, 764 F.2d 502, 505 (8th Cir.1985), set forth a detailed, specific mathematical formula for temporary regulatory takings cases.

In *Nemmers v. City of Dubuque*, 716 F.2d 1194 (8th Cir.1983) ("*Nemmers I*"), a landowner bought a tract of land that was later annexed by a city. Pending completion of the annexation, Nemmers invested in the development of a light industrial park upon the city's "receptiveness to industrial development of the [t]ract." But the annexed property was ultimately zoned agricultural, then residential. The Eighth Circuit Court of Appeals, reversing a district judge, held that Nemmers was due compensation for a taking of his vested rights in the planned industrial use. 716 F.2d at 1200. In a separate appeal regarding damages, the court awarded "the estimated value of the *difference in zoning*" between light industrial and residential.

764 F.2d 502, 505 (8th Cir.1985) ("*Nemmers II*") (emphasis added).

In *Wheeler III*, the Eleventh Circuit Court of Appeals, citing *Nemmers II*, held that

> In the case of a temporary regulatory taking, the landowner's loss takes the form of an injury to the property's potential for producing income or an expected profit. The landowner's compensable interest, therefore, is the return on the portion of the fair market value that is lost as a result of the regulatory restriction. Accordingly, the landowner should be awarded the market rate return computed over the period of the temporary taking on the *difference between the property's fair market value without the regulatory restriction and its fair market value with the restriction.*

833 F.2d at 271 (emphasis added) (citations omitted).

On remand following *Wheeler III*, the district court found that the invalidated ordinance had not destroyed the highest and best use of the land. Because "the fair market value of the [subject] property was not diminished by the enactment of [the ordinance]," the court awarded no damages. *See* 896 F.2d at 1350.

The Eleventh Circuit reversed. After reiterating the quoted language from *Wheeler III*, the court spelled out the damage formula for a temporary taking. "The property's fair market value without the regulatory restriction" was defined, however, as the value of "[t]he *complex* which appellants had the right to build," as if it were completed, and without regard to the cost of construction. *Wheeler IV*, 896 F.2d at 1351.[17] Yet no type of building was postulated in ascertaining the "fair market value with the restriction," even though other, and more profitable, uses remained.

This definitional inconsistency marks a departure from *Nemmers II*, and, accordingly, the theoretical underpinnings of

---

**16.** Query whether the Fifth Amendment even applies if the regulation does not serve a public purpose. *See id.*

**17.** As CORN observed during trial, it is irrelevant under *Wheeler IV* whether the completed project, valued at $2,300,000.00, would have cost $6,000.00 or $6,000,000.00, even though this would clearly affect the landowner's profit.

*Wheeler III.* Moreover, it is simply unfair to award compensatory damages for "an injury to the property's potential for producing income," 896 F.2d at 1351, when the property could still be put to its highest and best use. *See Greenbriar, Ltd. v. City of Alabaster,* 881 F.2d 1570, 1576 n. 11 (11th Cir.1989) ("[d]iscerning what alternative uses are permitted ... clearly is relevant in determining what damages result from an arbitrary decision").[18] The *Wheeler IV* formula seems designed to discourage arbitrary governmental acts as much as make landowners whole. Perhaps the most equitable solution would be to order reimbursement of all money invested by a landowner for the intended use, and award additional damages only if the most profitable use was taken. In any event, the Court is compelled to apply *Wheeler IV* so long as it remains the law of this Circuit. *E.g., Fox v. Acadia State Bank,* 937 F.2d 1566, 1567 (11th Cir.1991); *United States v. DeFabritus,* 605 F.Supp. 1538, 1544 (S.D.N.Y.1985) (a district court cannot ignore binding precedent with which it may disagree).

The Court has made findings as to the fair market values of the Property, CORN's equity, the market rate of return, and the proper rate of prejudgment interest. Before conducting any mathematical calculations, the period, physical scope, and permanence of the regulatory taking must be clarified.

### i. *Period of Taking*

■ There is little question that, under *Wheeler IV,* the temporary takings period began on July 12, 1977.[19] CORN asserts that it did not end until March 26, 1985, the date on which Judge Moriarty granted Plaintiff's Motion to Enforce Final Judgment. The Court disagrees. The Complaint in this action makes no claim for damages beyond March 4, 1983, when *Corn I* became final. More importantly, CORN did not file his Revised Site Plan until seven months after the appellate mandate, then did not move for enforcement of the Final Judgment for another year. No explanation was offered at trial for these lengthy delays. It would be patently unfair to reward CORN for his own delay.

### ii. *Physical Scope of Taking*

■ CORN seeks damages for the entire Property during the takings period, claiming that the Property was subject to a *de jure* or *de facto* moratorium through March 4, 1983. He quotes a footnote from *Corn II* as proof that the CITY has conceded, and the Eleventh Circuit has "conclusively determined," that "[t]here was no use to which Plaintiff could put the Property during this period":

> In its brief, the City has indicated that although the ordinances imposed a moratorium on development of Corn's land, the ban was a temporary one which arguably did not restrict all uses of all of Corn's property. However, at oral argument, in response to a direct question by the court as to whether Corn failed to pursue the variances available to him, counsel for the City stated that "there is no question" that Corn could not have sought any additional variances in view of the City's ban on all building by him. . . .

---

**18.** *Wheeler IV* also makes no allowance for any use to which the landowner may have put the money that he intended to invest in the development. Conversely, by strictly limiting damages to his equity, the owner is denied any recovery for the "spread" that he might have earned between a lender's interest rate and the project's expected return. These many considerations illustrate that "the issue of what constitutes just compensation in this context is a particularly meaty one, which merits substantial reflection and analysis." *MacDonald, Sommer & Frates v. Yolo County,* 477 U.S. 340, 363, 106 S.Ct. 2561, 2573, 91 L.Ed.2d 285 (1986) (White, J., dissenting).

**19.** The CITY points out that, even if CORN had received preliminary site plan approval on July 12, 1977, he would not have obtained a permit and built the project for several months. However, *Wheeler IV* measured the takings period from the City's arbitrary withdrawal of a building permit. 896 F.2d at 1351–52. The practical delays associated with completing construction affected neither the beginning *nor end* of the regulatory taking. *See id.*

816 F.2d at 1516 n. 3, *quoted in* Plaintiff's Trial Memorandum at 23.[20]

■■■ The quoted passage does not, as CORN suggests, delineate the timeframe during which the CITY banned all building by him; this Court agrees that a total ban lasted for nearly a full year. Moreover, as discussed *supra* at 1566–1567, *Corn II* was an appeal of Judge Gonzalez's order dismissing the Federal Court Action as not ripe under *Williamson County*. The appellate court was thus concerned with the finality of the City Council's July 12, 1977 actions, not the substantive merits of CORN's § 1983 claims. A footnoted reference regarding a procedural matter is hardly the proper foundation for the doctrine of law of the case. *See generally* 3 Fla. Jur.2d *Appellate Review* §§ 421–23 (1978) (collecting cases) (law of the case limited to rulings on questions of law actually presented on former appeal). Finally, even if the Eleventh Circuit intended to comment upon the merits, and this comment were not dictum, the undersigned would decline to apply the law of the case doctrine as inconsistent with the trial evidence and manifestly unjust. *See United States v. Robinson*, 690 F.2d 869, 872 (11th Cir. 1982).

The record establishes that after July 4, 1978, when the building moratorium expired by its own terms, there was no legal impediment to constructing any project that complied with the B–3 zoning classification, including the exact shopping center described in the Site Plan.[21] CORN's own expert, Ronald Ames, admitted that the mini-warehouse and shopping center are separate types of property that serve separate markets. CORN has suggested, but did not prove, that building a shopping center on the front portion of the Property would somehow "landlock" the rear portion; certainly the shopping center depicted in the Site Plan did not "landlock" the proposed mini-warehouse. In short, the shopping center could have been built, and assumedly would have generated the return that CORN now seeks from the CITY.

CORN quotes *Penn Central Transp. Co. v. City of New York*, 438 U.S. 104, 130–31, 98 S.Ct. 2646, 2662–63, 57 L.Ed.2d 631 (1978) for the proposition that "[t]aking jurisprudence does not divide a single parcel into discrete segments," but rather focuses on "the parcel as a whole." Plaintiff's Trial Memorandum at 25.[22] The *Penn Central* court, however, was discussing laws limiting subsurface excavation and development of air rights, not adjacent, distinct portions of a 261–acre Parcel.

CORN has consistently stated that, under *A.A. Profiles* and *Wheeler I*, a landowner may acquire a constitutionally protected property interest in a single intended use. For the front portion of the Property, however, a shopping center *was* CORN's intended use. On July 4, 1978, CORN regained all his sticks in the "bundle of rights commonly characterized as property." Plaintiff's Trial Memorandum at 15 (citing *Nollan v. California Coastal Comm'n*, 483 U.S. 825, 831, 107 S.Ct. 3141, 3145, 97 L.Ed.2d 677 (1987)). There being no "taking" of the front portion beyond this date, the CITY is not obligated to pay damages therefor. *See Spence v. Zimmerman*, 873 F.2d 256, 259 (11th Cir.1989) (citing *Kerley Industries, Inc. v. Pima County*, 785 F.2d 1444 (9th Cir.1986) (no deprivation where landowner had right to use de-

---

**20.** CORN cites language from a footnote in *Greenbriar, Ltd. v. City of Alabaster*, 881 F.2d 1570, 1576 n. 12 (11th Cir.1989) that in *Corn II* the court found "that the local authority had placed a complete moratorium on development." Inasmuch as the same opinion states that "[t]he plaintiff in *Corn* presented only a takings claim, and not a substantive due process claim," *see supra* at n. 6, it is unlikely that CORN truly wishes to adopt *Greenbriar's* recitation of facts.

**21.** CORN's argument that the CITY would likely have prevented *any* construction during pendency of the state appeal is both speculative and inconsistent with evidence that the mini-warehouse was the primary, if not sole, subject of dispute.

**22.** CORN's argument, taken to its logical extreme, could obligate the CITY to pay damages under *Wheeler IV* for the entire 261–acre Parcel purchased in 1966.

sired permit).[23]

### iii. *Permanence of Taking*

█ Finally, CORN raises another argument mentioned nowhere in the operative pleadings: that due to the delays occasioned by the CITY's actions, his loss "has matured into a permanent taking." Plaintiff's Trial Memorandum at 47. Having forever "missed the market" for his mini-warehouse/shopping center project, CORN requests damages under *Wheeler IV* for the "lifetime" of the proposed development. *Id.* at 50.

It should again be noted that development of the shopping center was possible at any time after July 4, 1978. As to the mini-warehouse, the valuations rendered by Ronald Ames, which steadily increase from $2,020,000.00 in July 1977 to $2,850,000.00 in March 1985, bely the suggestion that the project was no longer feasible. And, as the CITY notes, neither *Wheeler IV* nor any reported case authorizes permanent damages for a temporary taking. Beyond their inherently speculative nature, such damages would not adequately "account[ ] for the fact that the owner still retains the property after the taking is invalidated...." *Front Royal*, 749 F.Supp. at 1445.

█ The Court will therefore award damages for a regulatory taking of the entire Property between July 12, 1977 and July 4, 1978, and the rear portion of the Property between July 5, 1978 and March 4, 1983. Calculations will be made as to the damages suffered during each approximately one-year interval between valuation dates. Compounded interest, at the fluctuating T-Bill rates, will then be added for each year from the end of a given interval to the present. The sum of these intervals will be CORN's total award.

The individual calculations of damages and interest are detailed in the attached Appendix and summarized below:

| Date Range | Damages | Damages + Int |
|---|---|---|
| 7-12-77 to 7- 4-78 | $81,065.60 | $241,077.65 |
| 7- 5-78 to 6-30-79 | 39,934.03 | 110,613.47 |
| 7- 1-79 to 6-30-80 | 40,698.00 | 107,361.57 |
| 7- 1-80 to 6-30-81 | 43,253.38 | 102,334.23 |
| 7- 1-81 to 6-30-82 | 50,782.88 | 100,211.91 |
| 7- 1-82 to 3- 4-83 | 35,888.70 | 66,276.19 |
| **TOTAL DAMAGES** | **$291,622.59** | **$727,875.02** |

In light of all the foregoing, it is hereby ORDERED and ADJUDGED as follows:

1. The Clerk of the Court is directed to enter Final Judgment (a) against CORN on his claims against the individual Defendants HOWARD CRAFT, ALFONSO GEREFFI, JEROME J. COHAN, MORRIS KLEIN, LYMAN L. ALLEN, LOUIS GREENWALD, and HARRY KAUFMAN, but (b) for CORN, in the amount of $727,875.02, on his claims against the CITY.

2. The Court reserves ruling as to any prevailing party's entitlement to, and the reasonable amount of, attorneys' fees under 42 U.S.C. § 1988.

3. Any party seeking an award of attorneys' fees shall file a proper motion, with supporting affidavits and a memorandum of law, within thirty (30) days hereof.

DONE and ORDERED.

**23.** The Court's decision is better viewed as grounded in an absence of liability, and not, as CORN suggests, a duty to mitigate damages.

APPENDIX

1. **7–12–77 to 7–4–78**

   a. Damages

   | | |
   |---|---|
   | FMV–without restriction | $4,620,000.00 |
   | (FMV–with restriction) | (860,000.00) |
   | | 3,760,000.00 |
   | × Equity | .25 |
   | | 940,000.00 |
   | × Duration (in years) | .98 |
   | | 921,200.00 |
   | × Rate of Return (in %) | 8.88 |
   | DAMAGES | $ **81,065.60** |

   b. Interest

   **–7–4–78 to 12–31–78**

   | | |
   |---|---|
   | Damages plus accrued interest | $ 81,065.60 |
   | × T–Bill Rate (in %) | 7.20 |
   | × Duration (in years) | .49 |
   | Interest During Calendar Year | 2,846.40 |
   | NEW Damages plus accrued interest | $ 83,912.00 |

   **–1–1–79 to 12–31–79**

   | | |
   |---|---|
   | Damages plus accrued interest | $ 83,078.47 |
   | × T–Bill Rate (in %) | 10.00 |
   | × Duration (in years) | 1.00 |
   | Interest During Calendar Year | 8,307.85 |
   | NEW Damages plus accrued interest | $ 91,386.32 |

   **–1–1–80 to 12–31–80**

   | | |
   |---|---|
   | Damages plus accrued interest | $ 91,386.32 |
   | × T–Bill Rate (in %) | 11.50 |
   | × Duration (in years) | 1.00 |
   | Interest During Calendar Year | 10,509.43 |
   | NEW Damages plus accrued interest | $ 101,895.75 |

   **–1–1–81 to 12–31–81**

   | | |
   |---|---|
   | Damages plus accrued interest | $ 101,895.75 |
   | × T–Bill Rate (in %) | 14.10 |
   | × Duration (in years) | 1.00 |
   | Interest During Calendar Year | 14,367.30 |
   | NEW Damages plus accrued interest | $ 116,263.05 |

   **–1–1–82 to 12–31–82**

   | | |
   |---|---|
   | Damages plus accrued interest | $ 116,263.05 |
   | × T–Bill Rate (in %) | 10.70 |
   | × Duration (in years) | 1.00 |
   | Interest During Calendar Year | 12,440.15 |
   | NEW Damages plus accrued interest | $ 128,703.20 |

   **–1–1–83 to 12–31–83**

   | | |
   |---|---|
   | Damages plus accrued interest | $ 128,703.20 |
   | × T–Bill Rate (in %) | 8.50 |
   | × Duration (in years) | 1.00 |
   | Interest During Calendar Year | 10,939.77 |
   | NEW Damages plus accrued interest | $ 139,642.97 |

-1-1-84 to 12-31-84

| | |
|---|---:|
| Damages plus accrued interest | $ 139,642.97 |
| × T–Bill Rate (in %) | 9.60 |
| × Duration (in years) | 1.00 |
| Interest During Calendar Year | 13,405.73 |
| NEW Damages plus accrued interest | $ 153,048.70 |

-1-1-85 to 12-31-85

| | |
|---|---:|
| Damages plus accrued interest | $ 153,048.70 |
| × T–Bill Rate (in %) | 7.50 |
| × Duration (in years) | 1.00 |
| Interest During Calendar Year | 11,478.65 |
| NEW Damages plus accrued interest | $ 164,527.35 |

-1-1-86 to 12-31-86

| | |
|---|---:|
| Damages plus accrued interest | $ 164,527.35 |
| × T–Bill Rate (in %) | 6.00 |
| × Duration (in years) | 1.00 |
| Interest During Calendar Year | 9,871.64 |
| NEW Damages plus accrued interest | $ 174,398.99 |

-1-1-87 to 12-31-87

| | |
|---|---:|
| Damages plus accrued interest | $ 174,398.99 |
| × T–Bill Rate (in %) | 5.80 |
| × Duration (in years) | 1.00 |
| Interest During Calendar Year | 10,115.14 |
| NEW Damages plus accrued interest | $ 184,514.13 |

-1-1-88 to 12-31-88

| | |
|---|---:|
| Damages plus accrued interest | $ 184,514.13 |
| × T–Bill Rate (in %) | 6.70 |
| × Duration (in years) | 1.00 |
| Interest During Calendar Year | 12,362.45 |
| NEW Damages plus accrued interest | $ 196,876.58 |

-1-1-89 to 12-31-89

| | |
|---|---:|
| Damages plus accrued interest | $ 196,876.58 |
| × T–Bill Rate (in %) | 8.80 |
| × Duration (in years) | 1.00 |
| Interest During Calendar Year | 17,325.14 |
| NEW Damages plus accrued interest | $ 214,201.72 |

-1-1-90 to 12-31-90

| | |
|---|---:|
| Damages plus accrued interest | $ 214,201.72 |
| × T–Bill Rate (in %) | 8.10 |
| × Duration (in years) | 1.00 |
| Interest During Calendar Year | 17,350.34 |
| NEW Damages plus accrued interest | $ 231,552.06 |

-1-1-91 to 8-30-91

| | |
|---|---:|
| Damages plus accrued interest | $ 231,552.06 |
| × T–Bill Rate (in %) | 6.14 |
| × Duration (in years) | .67 |
| Interest During Calendar Year | 9,525.59 |
| NEW Damages plus accrued interest | **$241,077.65** |

**2.  7–5–78 to 6–30–79**

    a. Damages

| | |
|---|---:|
| FMV–without restriction | $2,070,000.00 |
| (FMV–with restriction) | (253,000.00) |
| | 1,817,000.00 |
| × Equity | .25 |
| | 454,250.00 |
| × Duration (in years) | .99 |
| | 449,707.50 |
| × Rate of Return (in %) | 8.88 |
| DAMAGES | $    39,934.03 |

    b. Interest

–6–30–79 to 12–31–79

| | |
|---|---:|
| Damages plus accrued interest | $   39,934.03 |
| × T–Bill Rate (in %) | 10.00 |
| × Duration (in years) | .50 |
| Interest During Calendar Year | 1,996.70 |
| NEW Damages plus accrued interest | $   41,930.73 |

–1–1–80 to 12–31–80

| | |
|---|---:|
| Damages plus accrued interest | $   41,930.73 |
| × T–Bill Rate (in %) | 11.50 |
| × Duration (in years) | 1.00 |
| Interest During Calendar Year | 4,822.03 |
| NEW Damages plus accrued interest | $   46,752.76 |

–1–1–81 to 12–31–81

| | |
|---|---:|
| Damages plus accrued interest | $   46,752.76 |
| × T–Bill Rate (in %) | 14.10 |
| × Duration (in years) | 1.00 |
| Interest During Calendar Year | 6,592.14 |
| NEW Damages plus accrued interest | $   53,344.90 |

–1–1–82 to 12–31–82

| | |
|---|---:|
| Damages plus accrued interest | $   53,344.90 |
| × T–Bill Rate (in %) | 10.70 |
| × Duration (in years) | 1.00 |
| Interest During Calendar Year | 5,707.90 |
| NEW Damages plus accrued interest | $   59,052.80 |

–1–1–83 to 12–31–83

| | |
|---|---:|
| Damages plus accrued interest | $   59,052.80 |
| × T–Bill Rate (in %) | 8.50 |
| × Duration (in years) | 1.00 |
| Interest During Calendar Year | 5,019.49 |
| NEW Damages plus accrued interest | $   64,072.29 |

–1–1–84 to 12–31–84

| | |
|---|---:|
| Damages plus accrued interest | $   64,072.29 |
| × T–Bill Rate (in %) | 9.60 |
| × Duration (in years) | 1.00 |
| Interest During Calendar Year | 6,150.94 |
| NEW Damages plus accrued interest | $   70,223.23 |

–1–1–85 to 12–31–85

| | |
|---|---:|
| Damages plus accrued interest | $ 70,223.23 |
| × T–Bill Rate (in %) | 7.50 |
| × Duration (in years) | 1.00 |
| Interest During Calendar Year | 5,266.74 |
| NEW Damages plus accrued interest | $ 75,489.97 |

–1–1–86 to 12–31–86

| | |
|---|---:|
| Damages plus accrued interest | $ 75,489.97 |
| × T–Bill Rate (in %) | 6.00 |
| × Duration (in years) | 1.00 |
| Interest During Calendar Year | 4,529.40 |
| NEW Damages plus accrued interest | $ 80,019.37 |

–1–1–87 to 12–31–87

| | |
|---|---:|
| Damages plus accrued interest | $ 80,019.37 |
| × T–Bill Rate (in %) | 5.80 |
| × Duration (in years) | 1.00 |
| Interest During Calendar Year | 4,641.12 |
| NEW Damages plus accrued interest | $ 84,660.49 |

–1–1–88 to 12–31–88

| | |
|---|---:|
| Damages plus accrued interest | $ 84,660.49 |
| × T–Bill Rate (in %) | 6.70 |
| × Duration (in years) | 1.00 |
| Interest During Calendar Year | 5,672.25 |
| NEW Damages plus accrued interest | $ 90,332.74 |

–1–1–89 to 12–31–89

| | |
|---|---:|
| Damages plus accrued interest | $ 90,332.74 |
| × T–Bill Rate (in %) | 8.80 |
| × Duration (in years) | 1.00 |
| Interest During Calendar Year | 7,949.28 |
| NEW Damages plus accrued interest | $ 98,282.02 |

–1–1–90 to 12–31–90

| | |
|---|---:|
| Damages plus accrued interest | $ 98,282.02 |
| × T–Bill Rate (in %) | 8.10 |
| × Duration (in years) | 1.00 |
| Interest During Calendar Year | 7,906.84 |
| NEW Damages plus accrued interest | $ 106,242.86 |

–1–1–91 to 8–30–91

| | |
|---|---:|
| Damages plus accrued interest | $ 106,242.86 |
| × T–Bill Rate (in %) | 6.14 |
| × Duration (in years) | .67 |
| Interest During Calendar Year | 4,370.62 |
| NEW Damages plus accrued interest | $ 110,613.47 |

3. **7–1–79 to 6–30–80**

a. Damages

| | |
|---|---:|
| FMV–without restriction | $2,210,000.00 |
| (FMV–with restriction) | (425,000.00) |
| | 1,785,000.00 |
| × Equity | .25 |
| | 446,250.00 |
| × Duration (in years) | 1.00 |
| | 446,250.00 |
| × Rate of Return (in %) | 9.12 |
| DAMAGES | $ 40,698.00 |

b. Interest

−6–30–80 to 12–31–80

| | |
|---|---|
| Damages plus accrued interest | $ 40,698.00 |
| × T–Bill Rate (in %) | 11.50 |
| × Duration (in years) | 0.50 |
| Interest During Calendar Year | 4,680.27 |
| NEW Damages plus accrued interest | $ 45,378.27 |

−1–1–81 to 12–31–81

| | |
|---|---|
| Damages plus accrued interest | $ 45,378.27 |
| × T–Bill Rate (in %) | 14.10 |
| × Duration (in years) | 1.00 |
| Interest During Calendar Year | 6,398.34 |
| NEW Damages plus accrued interest | $ 51,776.61 |

−1–1–82 to 12–31–82

| | |
|---|---|
| Damages plus accrued interest | $ 51,776.61 |
| × T–Bill Rate (in %) | 10.70 |
| × Duration (in years) | 1.00 |
| Interest During Calendar Year | 5,540.10 |
| NEW Damages plus accrued interest | $ 57,316.71 |

−1–1–83 to 12–31–83

| | |
|---|---|
| Damages plus accrued interest | $ 57,316.71 |
| × T–Bill Rate (in %) | 8.50 |
| × Duration (in years) | 1.00 |
| Interest During Calendar Year | 4,871.92 |
| NEW Damages plus accrued interest | $ 62,188.63 |

−1–1–84 to 12–31–84

| | |
|---|---|
| Damages plus accrued interest | $ 62,188.63 |
| × T–Bill Rate (in %) | 9.60 |
| × Duration (in years) | 1.00 |
| Interest During Calendar Year | 5,970.11 |
| NEW Damages plus accrued interest | $ 68,158.74 |

−1–1–85 to 12–31–85

| | |
|---|---|
| Damages plus accrued interest | $ 68,158.74 |
| × T–Bill Rate (in %) | 7.50 |
| × Duration (in years) | 1.00 |
| Interest During Calendar Year | 5,111.91 |
| NEW Damages plus accrued interest | $ 73,270.65 |

−1–1–86 to 12–31–86

| | |
|---|---|
| Damages plus accrued interest | $ 73,270.65 |
| × T–Bill Rate (in %) | 6.00 |
| × Duration (in years) | 1.00 |
| Interest During Calendar Year | 4,396.24 |
| NEW Damages plus accrued interest | $ 77,666.89 |

−1–1–87 to 12–31–87

| | |
|---|---|
| Damages plus accrued interest | $ 77,666.89 |
| × T–Bill Rate (in %) | 5.80 |
| × Duration (in years) | 1.00 |
| Interest During Calendar Year | 4,504.68 |
| NEW Damages plus accrued interest | $ 82,171.57 |

–1–1–88 to 12–31–88

| | |
|---|---:|
| Damages plus accrued interest | $ 82,171.57 |
| × T–Bill Rate (in %) | 6.70 |
| × Duration (in years) | 1.00 |
| Interest During Calendar Year | 5,505.50 |
| NEW Damages plus accrued interest | $ 87,677.07 |

–1–1–89 to 12–31–89

| | |
|---|---:|
| Damages plus accrued interest | $ 87,677.07 |
| × T–Bill Rate (in %) | 8.80 |
| × Duration (in years) | 1.00 |
| Interest During Calendar Year | 7,715.58 |
| NEW Damages plus accrued interest | $ 95,392.65 |

–1–1–90 to 12–31–90

| | |
|---|---:|
| Damages plus accrued interest | $ 95,392.65 |
| × T–Bill Rate (in %) | 8.10 |
| × Duration (in years) | 1.00 |
| Interest During Calendar Year | 7,726.80 |
| NEW Damages plus accrued interest | $ 103,119.45 |

–1–1–91 to 8–30–91

| | |
|---|---:|
| Damages plus accrued interest | $ 103,119.45 |
| × T–Bill Rate (in %) | 6.14 |
| × Duration (in years) | .67 |
| Interest During Calendar Year | 4,242.13 |
| NEW Damages plus accrued interest | $ 107,361.57 |

4. **7–1–80 to 6–30–81**

a. Damages

| | |
|---|---:|
| FMV–without restriction | $2,320,000.00 |
| (FMV–with restriction) | (425,000.00) |
| | 1,895,000.00 |
| × Equity | .25 |
| | 473,750.00 |
| × Duration (in years) | 1.00 |
| | 473,750.00 |
| × Rate of Return (in %) | 9.13 |
| DAMAGES | $ 43,253.38 |

b. Interest

–6–30–81 to 12–31–81

| | |
|---|---:|
| Damages plus accrued interest | $ 43,253.38 |
| × T–Bill Rate (in %) | 14.10 |
| × Duration (in years) | 1.00 |
| Interest During Calendar Year | 6,098.73 |
| NEW Damages plus accrued interest | $ 49,352.11 |

–1–1–82 to 12–31–82

| | |
|---|---:|
| Damages plus accrued interest | $ 49,352.11 |
| × T–Bill Rate (in %) | 10.70 |
| × Duration (in years) | 1.00 |
| Interest During Calendar Year | 5,280.68 |
| NEW Damages plus accrued interest | $ 54,632.79 |

–1–1–83 to 12–31–83

| | |
|---|---:|
| Damages plus accrued interest | $ 54,632.79 |
| × T–Bill Rate (in %) | 8.50 |
| × Duration (in years) | 1.00 |
| Interest During Calendar Year | 4,643.79 |
| NEW Damages plus accrued interest | $ 59,276.58 |

–1–1–84 to 12–31–84

| | |
|---|---:|
| Damages plus accrued interest | $ 59,276.58 |
| × T–Bill Rate (in %) | 9.60 |
| × Duration (in years) | 1.00 |
| Interest During Calendar Year | 5,690.55 |
| NEW Damages plus accrued interest | $ 64,967.13 |

–1–1–85 to 12–31–85

| | |
|---|---:|
| Damages plus accrued interest | $ 64,967.13 |
| × T–Bill Rate (in %) | 7.50 |
| × Duration (in years) | 1.00 |
| Interest During Calendar Year | 4,872.54 |
| NEW Damages plus accrued interest | $ 69,839.66 |

–1–1–86 to 12–31–86

| | |
|---|---:|
| Damages plus accrued interest | $ 69,839.66 |
| × T–Bill Rate (in %) | 6.00 |
| × Duration (in years) | 1.00 |
| Interest During Calendar Year | 4,190.38 |
| NEW Damages plus accrued interest | $ 74,030.04 |

–1–1–87 to 12–31–87

| | |
|---|---:|
| Damages plus accrued interest | $ 74,030.04 |
| × T–Bill Rate (in %) | 5.80 |
| × Duration (in years) | 1.00 |
| Interest During Calendar Year | 4,293.74 |
| NEW Damages plus accrued interest | $ 78,323.78 |

–1–1–88 to 12–31–88

| | |
|---|---:|
| Damages plus accrued interest | $ 78,323.78 |
| × T–Bill Rate (in %) | 6.70 |
| × Duration (in years) | 1.00 |
| Interest During Calendar Year | 5,247.69 |
| NEW Damages plus accrued interest | $ 83,571.47 |

–1–1–89 to 12–31–89

| | |
|---|---:|
| Damages plus accrued interest | $ 83,571.47 |
| × T–Bill Rate (in %) | 8.80 |
| × Duration (in years) | 1.00 |
| Interest During Calendar Year | 7,354.29 |
| NEW Damages plus accrued interest | $ 90,925.76 |

-1-1-90 to 12-31-90

| | |
|---|---|
| Damages plus accrued interest | $ 90,925.76 |
| × T-Bill Rate (in %) | 8.10 |
| × Duration (in years) | 1.00 |
| Interest During Calendar Year | 7,364.99 |
| NEW Damages plus accrued interest | $ 98,290.75 |

-1-1-91 to 8-30-91

| | |
|---|---|
| Damages plus accrued interest | $ 98,290.75 |
| × T-Bill Rate (in %) | 6.14 |
| × Duration (in years) | .67 |
| Interest During Calendar Year | 4,043.48 |
| NEW Damages plus accrued interest | $ 102,334.23 |

5. **7-1-81 to 6-30-82**

   a. Damages

| | |
|---|---|
| FMV-without restriction | $2,570,000.00 |
| (FMV-with restriction) | (425,000.00) |
| | 2,145,000.00 |
| × Equity | .25 |
| | 536,250.00 |
| × Duration (in years) | 1.00 |
| | 536,250.00 |
| × Rate of Return (in %) | 9.47 |
| DAMAGES | $ 50,782.88 |

   b. Interest

-6-30-82 to 12-31-82

| | |
|---|---|
| Damages plus accrued interest | $ 50,782.88 |
| × T-Bill Rate (in %) | 10.70 |
| × Duration (in years) | 0.50 |
| Interest During Calendar Year | 2,716.88 |
| NEW Damages plus accrued interest | $ 53,499.76 |

-1-1-83 to 12-31-83

| | |
|---|---|
| Damages plus accrued interest | $ 53,499.76 |
| × T-Bill Rate (in %) | 8.50 |
| × Duration (in years) | 1.00 |
| Interest During Calendar Year | 4,547.48 |
| NEW Damages plus accrued interest | $ 58,047.24 |

-1-1-84 to 12-31-84

| | |
|---|---|
| Damages plus accrued interest | $ 58,047.24 |
| × T-Bill Rate (in %) | 9.60 |
| × Duration (in years) | 1.00 |
| Interest During Calendar Year | 5,572.53 |
| NEW Damages plus accrued interest | $ 63,619.77 |

-1-1-85 to 12-31-85

| | |
|---|---|
| Damages plus accrued interest | $ 63,619.77 |
| × T-Bill Rate (in %) | 7.50 |
| × Duration (in years) | 1.00 |
| Interest During Calendar Year | 4,771.48 |
| NEW Damages plus accrued interest | $ 68,391.25 |

-1-1-86 to 12-31-86

| | |
|---|---|
| Damages plus accrued interest | $ 68,391.25 |
| × T-Bill Rate (in %) | 6.00 |
| × Duration (in years) | 1.00 |
| Interest During Calendar Year | 4,103.48 |
| NEW Damages plus accrued interest | $ 72,494.73 |

■■■■■■■

■■■■■■

–1–1–87 to 12–31–87

| | |
|---|---:|
| Damages plus accrued interest | $ 72,494.73 |
| × T–Bill Rate (in %) | 5.80 |
| × Duration (in years) | 1.00 |
| Interest During Calendar Year | 4,204.69 |
| NEW Damages plus accrued interest | $ 76,699.42 |

–1–1–88 to 12–31–88

| | |
|---|---:|
| Damages plus accrued interest | $ 76,699.42 |
| × T–Bill Rate (in %) | 6.70 |
| × Duration (in years) | 1.00 |
| Interest During Calendar Year | 5,138.86 |
| NEW Damages plus accrued interest | $ 81,838.28 |

–1–1–89 to 12–31–89

| | |
|---|---:|
| Damages plus accrued interest | $ 81,838.28 |
| × T–Bill Rate (in %) | 8.80 |
| × Duration (in years) | 1.00 |
| Interest During Calendar Year | 7,201.77 |
| NEW Damages plus accrued interest | $ 89,040.05 |

–1–1–90 to 12–31–90

| | |
|---|---:|
| Damages plus accrued interest | $ 89,040.05 |
| × T–Bill Rate (in %) | 8.10 |
| × Duration (in years) | 1.00 |
| Interest During Calendar Year | 7,212.24 |
| NEW Damages plus accrued interest | $ 96,252.29 |

–1–1–91 to 8–30–91

| | |
|---|---:|
| Damages plus accrued interest | $ 96,252.29 |
| × T–Bill Rate (in %) | 6.14 |
| × Duration (in years) | .67 |
| Interest During Calendar Year | 3,959.63 |
| NEW Damages plus accrued interest | $ 100,211.91 |

6.  **7–1–82 to 3–4–83**

   a. Damages

| | |
|---|---:|
| FMV–without restriction | $2,750,000.00 |
| (FMV–with restriction) | (425,000.00) |
| | 2,325,000.00 |
| × Equity | .25 |
| | 581,250.00 |
| × Duration (in years) | .68 |
| | 395,250.00 |
| × Rate of Return (in %) | 9.08 |
| DAMAGES | $ 35,888.70 |

   b. Interest

   –3–4–83 to 12–31–83

| | |
|---|---:|
| Damages plus accrued interest | $ 35,888.70 |
| × T–Bill Rate (in %) | 8.50 |
| × Duration (in years) | .82 |
| Interest During Calendar Year | 2,501.44 |
| NEW Damages plus accrued interest | $ 38,390.14 |

–1–1–84 to 12–31–84

| | |
|---|---:|
| Damages plus accrued interest | $ 38,390.14 |
| × T–Bill Rate (in %) | 9.60 |
| × Duration (in years) | 1.00 |
| Interest During Calendar Year | 3,685.45 |
| NEW Damages plus accrued interest | $ 42,075.59 |

–1–1–85 to 12–31–85

| | |
|---|---:|
| Damages plus accrued interest | $ 42,075.59 |
| × T–Bill Rate (in %) | 7.50 |
| × Duration (in years) | 1.00 |
| Interest During Calendar Year | 3,155.67 |
| NEW Damages plus accrued interest | $ 45,231.26 |

–1–1–86 to 12–31–86

| | |
|---|---:|
| Damages plus accrued interest | $ 45,231.26 |
| × T–Bill Rate (in %) | 6.00 |
| × Duration (in years) | 1.00 |
| Interest During Calendar Year | 2,713.88 |
| NEW Damages plus accrued interest | $ 47,945.14 |

–1–1–87 to 12–31–87

| | |
|---|---:|
| Damages plus accrued interest | $ 47,945.14 |
| × T–Bill Rate (in %) | 5.80 |
| × Duration (in years) | 1.00 |
| Interest During Calendar Year | 2,780.82 |
| NEW Damages plus accrued interest | $ 50,725.96 |

–1–1–88 to 12–31–88

| | |
|---|---:|
| Damages plus accrued interest | $ 50,725.96 |
| × T–Bill Rate (in %) | 6.70 |
| × Duration (in years) | 1.00 |
| Interest During Calendar Year | 3,398.64 |
| NEW Damages plus accrued interest | $ 54,124.60 |

–1–1–89 to 12–31–89

| | |
|---|---:|
| Damages plus accrued interest | $ 54,124.60 |
| × T–Bill Rate (in %) | 8.80 |
| × Duration (in years) | 1.00 |
| Interest During Calendar Year | 4,762.96 |
| NEW Damages plus accrued interest | $ 58,887.56 |

–1–1–90 to 12–31–90

| | |
|---|---:|
| Damages plus accrued interest | $ 58,887.56 |
| × T–Bill Rate (in %) | 8.10 |
| × Duration (in years) | 1.00 |
| Interest During Calendar Year | 4,769.89 |
| NEW Damages plus accrued interest | $ 63,657.45 |

–1–1–91 to 8–30–91

| | |
|---|---:|
| Damages plus accrued interest | $ 63,657.45 |
| × T–Bill Rate (in %) | 6.14 |
| × Duration (in years) | .67 |
| Interest During Calendar Year | 2,618.74 |
| NEW Damages plus accrued interest | $ **66,276.19** |